Daniel Beckwitt v. State of Maryland, No. 16, September Term, 2021

**SUBJECT MATTER JURISDICTION – GROSS NEGLIGENCE INVOLUNTARY MANSLAUGHTER – LEGAL DUTY INVOLUNTARY MANSLAUGHTER – LESSER-INCLUDED OFFENSE – JURY INSTRUCTION – SECOND-DEGREE DEPRAVED HEART MURDER –** Court of Appeals rejected petitioner's argument that old English statutes deprived circuit court of subject matter jurisdiction necessary to try case. Because petitioner failed to raise issue in circuit court, matter was not preserved for appellate review. Even if issue were preserved, Court would conclude that statutes on which petitioner relied would not preclude prosecution or otherwise serve as defense.

Court of Appeals held that evidence was sufficient to support petitioner's conviction for involuntary manslaughter under both gross negligence and failure to perform legal duty theories of involuntary manslaughter. Court held that evidence was sufficient to establish gross negligence involuntary manslaughter because, among other things, petitioner's conduct constituted gross departure from that of ordinarily careful and prudent person under same circumstances and disregard of consequences which might ensue, and so demonstrated wanton and reckless disregard for victim's life. Evidence was sufficient to establish legal duty involuntary manslaughter because evidence demonstrated that victim was petitioner's employee and, as such, petitioner had duty to provide victim with reasonably safe workplace, which he failed to do with reckless indifference as to endangerment of victim and that failure constituted gross negligence.

Court held that there was sufficient evidence for jury to conclude that petitioner's conduct was both actual and legal cause of victim's death. Viewing evidence in light most favorable to State, evidence was sufficient for jury to have found beyond reasonable doubt all elements of involuntary manslaughter under both gross negligence and legal duty theories.

Court of Appeals determined that it need not reach issue as to whether legal duty involuntary manslaughter is lesser-included offense of depraved heart murder, because evidence was sufficient to support petitioner's conviction for involuntary manslaughter under both theories presented. Nonetheless, Court concluded that legal duty involuntary manslaughter is not lesser-included offense of depraved heart murder, but gross negligence involuntary manslaughter is.

Court concluded that petitioner's contention as to legal duty involuntary manslaughter jury instruction was not preserved for appellate review. If issue were preserved, however, Court would conclude that circuit court did not abuse its discretion in giving instruction because it was correct statement of law and covered essential elements of offense.

As final matter, Court of Appeals held that evidence was not sufficient to support petitioner's conviction for second-degree depraved heart murder because his conduct, although demonstrating reckless disregard for human life, was not conduct that was likely,

if not certain, to cause death, and did not constitute conduct that demonstrated extreme indifference to value of human life.  Petitioner's conduct—including having victim dig tunnels beneath home, while living and working in basement with electrical power provided by multiple extension cords and power strips and that was filled with trash and debris which severely hampered victim's escape in event of emergency—whether considered individually or cumulatively, although demonstrating reckless disregard for human life did not rise to level of conduct that was reasonably likely, if not certain, to cause death.

Circuit Court for Montgomery County
Case No. 133838C
Argued: December 7, 2021

IN THE COURT OF APPEALS

OF MARYLAND

No. 16

September Term, 2021

_____

DANIEL BECKWITT

v.

STATE OF MARYLAND

_____

Getty, C.J.
McDonald
Watts
Hotten
Booth
Biran
Adkins, Sally D. (Senior Judge,
Specially Assigned),

JJ.

_____

Opinion by Watts, J.

_____

Filed: January 28, 2022

Pursuant to Maryland Uniform Electronic Legal
Materials Act
(§§ 10-1601 et seq. of the State Government Article) this document is authentic.



Suzanne C. Johnson, Clerk

This case involves the tragic death of twenty-one-year-old Askia Khafra, who died in a fire while trying in vain to escape from the reprehensible conditions of his workplace in the basement of his employer Daniel Beckwitt's, Petitioner's/Cross-Respondent's, home. Following a trial in the Circuit Court for Montgomery County, a jury found Beckwitt guilty of second-degree depraved heart murder and involuntary manslaughter. The circuit court sentenced Beckwitt to twenty-one years' imprisonment, suspending all but nine years, with credit for sixty days of time served, for second-degree depraved heart murder, and merged the conviction for involuntary manslaughter for sentencing. Beckwitt appealed, and the Court of Special Appeals held that the evidence was sufficient to support the conviction for gross negligence involuntary manslaughter but insufficient to support the conviction for depraved heart murder. See Beckwitt v. State, 249 Md. App. 333, 346, 245 A.3d 201, 209 (2021).

Beckwitt filed a petition for a writ of *certiorari* raising four issues—whether the circuit court lacked subject matter jurisdiction to enter a conviction on involuntary manslaughter due to old English statutes concerning a lack of liability for accidental fires, whether the evidence was sufficient to support the conviction for involuntary manslaughter, whether legal duty involuntary manslaughter is a lesser-included offense of depraved heart murder, and whether the circuit court erred by failing to correctly instruct the jury on the elements of legal duty involuntary manslaughter. The State, Respondent/Cross-Petitioner, filed a conditional cross-petition, raising one issue—whether the evidence was sufficient to support the conviction for second-degree depraved heart murder. We granted both the petition and conditional cross-petition.

We answer the questions raised as follows. To begin with, we reject Beckwitt's argument that, because the case involved an accidental house fire, certain old English statutes deprived the circuit court of subject matter jurisdiction. In actuality, the argument does not involve a question of subject matter jurisdiction and because Beckwitt failed to raise the issue in the circuit court, the matter is not preserved for appellate review. Were we to consider the issue, though, we would determine that the statutes on which Beckwitt relies do not preclude his prosecution or otherwise serve as a defense.

Next, we hold that the evidence was sufficient to support Beckwitt's conviction for involuntary manslaughter under both a gross negligence and failure to perform a legal duty theory of the offense. We hold that the evidence was sufficient to establish gross negligence involuntary manslaughter because Beckwitt's conduct, in causing Khafra to live and work in dangerous conditions, constituted a gross departure from that of an ordinarily careful and prudent person under the same circumstances and a disregard for the consequences which might ensue and so demonstrated a wanton and reckless disregard for Khafra's life. Beckwitt's conduct was likely to result in harm to Khafra at any moment and an ordinarily prudent person under similar circumstances would have been conscious of the risk to Khafra. The evidence was sufficient to establish legal duty involuntary manslaughter because the evidence demonstrated that Khafra was Beckwitt's employee and, as such, Beckwitt had a duty to provide Khafra with a reasonably safe workplace, which he failed to do with reckless indifference as to the endangerment of Khafra and that failure constituted gross negligence.

In addition, we hold that there was sufficient evidence for the jury to conclude that

Beckwitt's conduct was both the actual and legal cause of Khafra's death. Viewing the evidence in the light most favorable to the State, the evidence was sufficient for the jury to have found beyond a reasonable doubt the essential elements of involuntary manslaughter under both a gross negligence and legal duty theory.

Because we conclude that the evidence was sufficient to support Beckwitt's involuntary manslaughter conviction under both theories, we need not reach the issue of whether legal duty involuntary manslaughter is a lesser-included offense of depraved heart murder. Nonetheless, we determine that legal duty involuntary manslaughter is not a lesser-included offense of depraved heart murder, although gross negligence involuntary manslaughter is.

We conclude that Beckwitt's contention that the circuit court erred or abused its discretion by failing to instruct the jury as to all of the essential elements of legal duty involuntary manslaughter is not preserved for appellate review. If the issue were preserved, however, we would conclude that the circuit court did not abuse its discretion in giving the instruction because it constituted a correct statement of law and covered the essential elements of the offense.

Finally, in agreement with the Court of Special Appeals, we hold that the evidence was not sufficient to support Beckwitt's conviction for second-degree depraved heart murder because his conduct, although demonstrating a wanton and reckless disregard for human life, was not the kind of conduct that was likely, if not certain, to have caused death, and thus did not constitute conduct that demonstrated an extreme indifference to the value of human life. Beckwitt's conduct—including having Khafra dig tunnels beneath his home

while living and working in a basement with electrical power provided by multiple extension cords and power strips and that was filled with trash and debris which severely hampered Khafra's escape in the event of an emergency—whether considered individually or cumulatively, although demonstrating a reckless disregard for human life, did not constitute conduct that was reasonably likely, if not certain, to cause death. Accordingly, we affirm the judgment of the Court of Special Appeals.

**BACKGROUND**

This case involves uncommon and, indeed, bizarre facts which, in its reported opinion, the Court of Special Appeals set forth in a well-written, thorough, and detailed manner. See Beckwitt, 249 Md. App. at 347-51, 245 A.3d at 209-11. As there is no material dispute between the parties about the accuracy of the facts—although the parties certainly dispute whether the facts were sufficient to support Beckwitt's convictions—we adopt the facts as set forth by the Court of Special Appeals:

> This case involves the tragic death of Askia Khafra, a twenty-one-year-old who died while trying to escape a fire in [Beckwitt]'s basement. At the time of the fire, [Beckwitt] was twenty-six years old. The unfortunate series of events that brought Khafra and [Beckwitt] together arose from Khafra's idea to create a smartphone application or "app" called Equity Shark. Khafra envisioned Equity Shark as streamlining the process for average people to invest in "starter companies" or small businesses that had not yet gone public and needed funding. Khafra expended considerable effort in developing the app. In furtherance of that goal, Khafra browsed internet chatrooms looking for investors. Khafra found his first investor—[Beckwitt]—in such a chatroom.
>
> Khafra pitched his business idea to [Beckwitt], and explained that he was looking for approximately $5,000 to go to San Francisco to apply for a

Thiel Fellowship.[1]   According to the parties' briefs, [Beckwitt] invested approximately $10,000 for a 5% stake in Equity Shark.[2]   Khafra and [Beckwitt] went on to develop a close friendship.  Khafra apparently became fascinated with [Beckwitt] due to [Beckwitt]'s wealth and financial success.  Khafra looked to [Beckwitt] as someone who could help him grow Equity Shark, not just financially, but by assisting with computer coding and other efforts needed to develop the app into a viable business.  Unfortunately, Equity Shark never took off as planned, and Khafra was not accepted for the Thiel Fellowship.

In order to repay [Beckwitt]'s $10,000 investment, Khafra agreed to dig tunnels underneath [Beckwitt]'s house.  [Beckwitt] had been building tunnels and an underground bunker beneath his home because he apparently feared a nuclear war with North Korea.

Khafra was not the first person to dig tunnels for [Beckwitt].  Douglas Hart, who was approximately twenty years old at the time,[3] dug tunnels on several occasions from approximately October 2016 to April 2017.  Logistically, Hart would drive his car to Maryland,[4] meet [Beckwitt] at a McDonald's, and then [Beckwitt] would require Hart to wear sunglasses with duct tape on them to obscure Hart's vision while [Beckwitt] drove the two to [Beckwitt]'s home.  Despite the fact that [Beckwitt] actually lived in Maryland, he gave Hart the impression that they were going to Virginia.  When Hart visited [Beckwitt] to dig tunnels, he typically stayed in the tunnels and basement area for approximately a month at a time and understood that he was not allowed into the rest of the house.  Hart indicated that he was physically incapable of leaving the basement/tunnel area, and that although there was a door from the basement leading directly to the outside, that door was kept locked and [Beckwitt] always had the key.  When Hart communicated to [Beckwitt] that he wanted to go outside for fresh air or to get food, however, [Beckwitt] would oblige him.  Nevertheless, [Beckwitt] required Hart to wear the duct-taped sunglasses upon going outside to prevent Hart from learning the location of [Beckwitt]'s house.

[1]The transcript incorrectly refers to this as the "Peter Field Fellowship."  The specifics of the Fellowship itself, however, such as the age limit, the requirement to drop out of school in order to attend, and the Fellowship's general purpose, persuade us that Khafra was pursuing a "Thiel Fellowship" rather than a "Field Fellowship."  *See* Thiel Fellowship, *FAQ*, https://thielfellowship.org/faq/ (last visited Jan. 8, 2021).

[2]There appears to be some discrepancy regarding the total amount of [Beckwitt]'s investment, but that discrepancy is immaterial to the outcome of this appeal.

[3]Hart testified at the April 2019 trial that he was twenty-three years old.  From this fact we extrapolate that he was approximately twenty years old when he began working in [Beckwitt]'s tunnels in October 2016.

[4]At trial, Hart indicated that he was living in New York.

In early 2017, Khafra began digging tunnels at [Beckwitt]'s home for $150 a day. [Beckwitt] typically picked Khafra up at Khafra's parents' house in the early morning hours, around 3:00 a.m., and like Hart, required Khafra to be blindfolded during the trip to [Beckwitt]'s house.[5] Khafra would dig underneath [Beckwitt]'s home approximately once a month to every two months, and would stay anywhere from a few days to a few weeks at a time.[6] During his stays, Khafra mostly remained in the bunker area in the tunnels. According to [Beckwitt]'s brief, "Khafra roamed freely in the basement and the tunnels, but he was not permitted to come up to the first or second floors of the residence." Rather than take showers, Khafra cleaned himself using disposable wipes. To relieve himself, Khafra would urinate and defecate in a bucket he kept in the tunnels. Every few days, Khafra and [Beckwitt] used a winch system to haul the bucket from the basement to the first floor, where [Beckwitt] himself would dispose of its contents in the first-floor bathroom. Because [Beckwitt] did not own a phone, Khafra could only communicate with [Beckwitt] from the basement and tunnels using Google apps such as Google Voice and V Chat.[7] [Beckwitt] used numerous extension cords and power strips to provide electricity to the tunnels. In his interviews with police, [Beckwitt] intimated his familiarity with the failing power cords and having to reset the circuit breaker.

On September 3, 2017, Khafra went to [Beckwitt]'s home to resume work in the tunnels. A week later, while digging in the tunnels on September 10 at 2:32 a.m., Khafra messaged [Beckwitt] using Google Hangouts, stating "holy [s**t] bro there's no power down here." Approximately five minutes later, at 2:37 a.m., Khafra indicated that there was smoke in the basement. At 2:51 a.m., Khafra wrote again, stating that he no longer believed there was smoke in the basement, but that the lights had gone out and it was "pitch black down [there]" with no airflow. Khafra's message asked [Beckwitt] to "please try to fix when you see this."

[Beckwitt] did not see Khafra's messages until he woke up at approximately 9 a.m. At 9:27 a.m., [Beckwitt] wrote to Khafra that there had been a "pretty major electrical failure" and that [Beckwitt] was switching the

---

[5]During a trip to [Beckwitt]'s home, Khafra learned that [Beckwitt] actually lived in Bethesda, Maryland.

[6]Khafra's father testified at trial that he recalled Khafra going to [Beckwitt]'s house in January, February, March, April, and September of 2017.

[7]"Google Voice" is a program that "gives you a phone number for calling, text messaging, and voicemail." https://play.google.com/store/apps/details?id=com.google.android.apps.googlevoice&=en_US & gl=US (last visited Jan. 8, 2021).

"V Chat" is a private messenger service that allows users to "communicate instantly while avoiding [text messaging] fees[.]" https://play.google.com/store/apps/details?id=com.wVChat_9255903 (last visited Jan. 8, 2021).

power over to a different circuit. [Beckwitt] then went back to sleep, and awoke at approximately 3 p.m. [Beckwitt] went downstairs from his second-floor bedroom to get something to eat, and at around 4 p.m., he heard a beeping sound coming from the carbon monoxide detector in the dining room. [Beckwitt] understood the beep to signify a loss of power, which he confirmed when he could no longer hear the refrigerator running. [Beckwitt] waited approximately twenty to thirty minutes, believing that the circuit breaker would reset itself. When the power failed to return, [Beckwitt] went to the basement to manually reset the breaker. [Beckwitt] did not see Khafra while in the basement resetting the breaker.

On his way up the stairs from the basement to the first floor, [Beckwitt] heard an explosion, which he believed to be either the refrigerator's compressor or the air conditioner. [Beckwitt] went to the kitchen to see if the refrigerator's compressor was working, and immediately saw smoke rising out of the kitchen floor. [Beckwitt] promptly headed back to the basement to tell Khafra that there was a fire, and that Khafra needed to get out. [Beckwitt] heard Khafra yell "yo dude," but he could not see him through all of the smoke. Fearing that he would not be able to take the basement stairs to the first floor, [Beckwitt] exited the basement by unlocking the basement door that led directly to the outside.[8] Because he did not have a cellular phone, and because it would have been dangerous to return to his second-floor bedroom to call 9-1-1 from his computer, [Beckwitt] began to yell for help. [Beckwitt]'s neighbors called 9-1-1.

Firefighters from Montgomery County Fire and Rescue Service responded to [Beckwitt]'s home at approximately 4:23 p.m. The firefighters struggled to navigate through [Beckwitt]'s home to extinguish the fire, however, because, as [Beckwitt] concedes, "[t]he home by all accounts was a hoarder's home." Put simply, [Beckwitt]'s home was filled with an extreme amount of debris, trash, and other objects that made navigation difficult. In fact, it took firefighters approximately a minute and a half to two minutes to traverse the short distance from the basement's side entrance to the fire. Firefighters extinguished the fire with two or three sprays of water lasting approximately fifteen to thirty seconds each. When the steam finally cleared, firefighters found Khafra's lifeless body in the middle of the basement.

Beckwitt, 249 Md. App. at 347-51, 245 A.3d at 209-11 (footnotes and some alterations in

---

[8]Although he could not remember for certain, [Beckwitt] indicated that he "[thought he] had to" unlock the basement door to exit. [Beckwitt] could not recall whether the key was already in the door or whether he had it at the time, but told police it was "common" to keep the key in the door.

original).

We include additional facts below as necessary.

## Opinion of the Court of Special Appeals

On January 28, 2021, the Court of Special Appeals affirmed Beckwitt's conviction for involuntary manslaughter, reversed the conviction for depraved heart murder, and remanded the case to the circuit court for sentencing on involuntary manslaughter. See Beckwitt, 249 Md. App. at 346, 245 A.3d at 209. The Court of Special Appeals concluded that Beckwitt's conduct, under the totality of the circumstances, was sufficient to establish gross negligence involuntary manslaughter. Id. at 362, 245 A.3d at 218. In reaching this conclusion, the Court of Special Appeals considered "the inherent dangerousness of [Beckwitt's] act[s], as judged by a reasonable person[,] combined with environmental risk factors, which, together, [made] the particular activity more or less likely at any moment to bring harm to another[.]" Id. at 362, 245 A.3d at 218 (cleaned up). The Court of Special Appeals determined that Beckwitt placed Khafra, who was not an experienced construction worker, in a dangerous situation by paying him to dig tunnels beneath his home with electricity provided by "extension cords and power strips with an apparent history of failing" and that Khafra could contact Beckwitt in case of an emergency only by messages sent through "Google apps" in the hope that Beckwitt would receive them. Id. at 363, 245 A.3d at 218.

The Court of Special Appeals noted that on the day of his death when Khafra believed he smelled smoke, his early morning messages went undetected for more than six hours until Beckwitt eventually woke up. See id. at 363, 245 A.3d at 218. The Court of

Special Appeals indicated that Beckwitt deprived Khafra of exact knowledge of his whereabouts by blindfolding him in transit to the home, which left Khafra, who apparently had internet and phone service, without knowledge of his location to call for help. See id. at 363, 245 A.3d at 218-19. The Court of Special Appeals determined that "the amount of debris and detritus in" the basement contributed to the environmental risk factors and "elevated the danger by hampering Khafra's ability to escape in the event of an emergency." Id. at 363, 245 A.3d at 219.

The Court of Special Appeals pointed out that Beckwitt's conduct on the day of the fire included that, upon seeing Khafra's messages at approximately 9 a.m. regarding a power outage and the possible odor of smoke, Beckwitt's sole response was to tell Khafra that there had been a "pretty major electrical failure," and to switch the power to another breaker. Id. at 364, 245 A.3d at 219. Later, after the carbon monoxide alarm started to beep, Beckwitt "waited approximately twenty to thirty minutes before finally resetting the circuit breaker despite the fact that the previous electrical failure had left Khafra in 'pitch black' darkness with no airflow." Id. at 364, 245 A.3d at 219. The Court of Special Appeals noted that "at no point in time did [Beckwitt] ask Khafra to leave the basement for precautionary reasons." Id. at 364, 245 A.3d at 219.

The Court of Special Appeals determined that the environmental risk factors and Beckwitt's conduct in relation to the risk factors, considered together, "sufficiently demonstrate[d] the requisite wanton and reckless disregard for Khafra's life necessary to support a conviction for gross negligence involuntary manslaughter." Id. at 364, 245 A.3d at 219. The Court of Special Appeals concluded that the State produced sufficient evidence

of actual causation, because but for Beckwitt having "Khafra work in a dangerous environment, Khafra would not have died." Id. at 372, 245 A.3d at 224. The Court of Special Appeals determined that there was sufficient evidence of legal causation because, based on the facts, "it was foreseeable that a fire might occur in the basement, and if it did, Khafra's ability to safely escape would be severely restricted." Id. at 373, 245 A.3d at 224.

On the other hand, the Court of Special Appeals concluded that Beckwitt's "conduct, viewed in conjunction with the surrounding circumstances, d[id] not satisfy the evidentiary standard required for depraved heart murder." Id. at 377, 245 A.3d at 227. From the Court of Special Appeals's perspective, Beckwitt's "conduct itself did not demonstrate an extreme disregard for human life reasonably likely to cause death." Id. at 377, 245 A.3d at 227 (emphasis omitted). The Court of Special Appeals explained:

> In our view, hiring someone to dig tunnels underneath a hoarder's home may demonstrate a reckless disregard for human life, but it is not the type of conduct that is likely, if not certain, to cause death, and thus does not rise to the level of opprobrious conduct that depraved heart murder proscribes— conduct that is so extreme in its disregard of human life that it may be deemed willful.

Id. at 378, 245 A.3d at 227.

The Court of Special Appeals concluded that it need not consider whether the evidence was sufficient to support a conviction for involuntary manslaughter under the failure to perform a legal duty theory because there was only one conviction for involuntary manslaughter, which the Court affirmed on the basis of gross negligence. See id. at 382

- 10 -

n.21, 245 A.3d at 230 n.21.[9]

### Petition for a Writ of *Certiorari* and Conditional Cross-Petition

Beckwitt petitioned for a writ of *certiorari*, raising the following four issues:

1. As a matter of first impression, was the evidence legally sufficient to permit a rational trier of fact to find that Petitioner was guilty of involuntary manslaughter beyond a reasonable doubt for permitting his friend to work in a home with hoarding conditions accompanied by power outages?

2. As a matter of first impression, is legal duty manslaughter a type of gross negligence manslaughter that serves as a lesser included offense of depraved-heart murder, thereby requiring review of Petitioner's challenges to the legal duty manslaughter conviction?

3. Did the circuit court commit reversible error by failing to instruct the essential elements of legal duty manslaughter, for which there is no pattern jury instruction?

4. As a matter of first impression, did the circuit court lack subject matter jurisdiction to enter a conviction against an occupant of a home on a common law involuntary manslaughter charge resulting from an accidental housefire?

The State filed a conditional cross-petition, raising the following issue: "In an issue of first impression, does the line separating second-degree depraved heart murder and gross negligence manslaughter depend upon the likelihood of death and, if so, was the evidence sufficient in this case to support the jury's verdict of second-degree murder?" On June 22, 2021, we granted the petition and conditional cross-petition. See Beckwitt v. State, 474 Md. 720, 255 A.3d 1090 (2021).

---

[9]In addition, the Court of Special Appeals concluded that the circuit court did not err with respect to other matters raised on appeal by Beckwitt, including, among other things, not giving jury instructions concerning assumption of the risk, knowledge of the conditions by the victim, and the element of causation, and not sustaining objections to alleged improper remarks by the prosecutor during closing argument. See Beckwitt, 249 Md. App. at 382-401, 245 A.3d at 230-41. These issues are not before us.

- 11 -

# DISCUSSION

## I. Subject Matter Jurisdiction

## The Parties' Contentions

Beckwitt's first contention is as unusual as the facts of the case. Beckwitt contends that a series of English statutes from the 1700s leading up to the enactment of the Fires Prevention (Metropolis) Act of 1774 prohibit today in Maryland a criminal prosecution "against someone in whose home a fire accidentally began." According to Beckwitt, the statutes were in existence as of July 4, 1776, and courts across the United States have incorporated them into their common law. Beckwitt contends that the statutes serve as a complete bar to any action arising from an accidental house fire, and, as such, divest the circuit court of subject matter jurisdiction over the prosecution of this case. Beckwitt urges this Court to determine that the old English statutes are a part of the common law of Maryland today, and that he is "entitled to any defense that was available by English statute that was incorporated into Maryland common law."

The State responds that the 300-year-old statutes to which Beckwitt refers do not prohibit his prosecution in this case and even if somehow the statues could be construed as having that effect, the issue is not one of subject matter jurisdiction. The State points out that a lack of subject matter jurisdiction occurs where jurisdiction is lacking in a fundamental sense, not where a trial court makes a ruling in violation of a statutory restriction on the court's authority or discretion. The State asserts that, because Beckwitt's contention about the English statutes does not involve an issue of subject matter jurisdiction, he was required to raise the issue in the circuit court and, because he failed to

do so, the contention is not preserved for appellate review. The State maintains that, even

if the issue were preserved, Beckwitt has conceded that the preeminent authority on the

topic has concluded that the Fires Prevention (Metropolis) Act of 1774 is not applicable in

Maryland and contends that no other authority supports Beckwitt's contention. The State

points out that, even if the Fires Prevention (Metropolis) Act of 1774 were somehow

applicable today in Maryland, it would not prohibit the prosecution of this case because

the *actus reus*[10] supporting the charges against Beckwitt involved the creation of dangerous

circumstances preventing Khafra's escape from the fire—not causing the fire itself.

### Standard of Review

It is well settled that a "lack of subject matter jurisdiction may be raised at any time,

including initially on appeal" and "need not be raised by a party, but may be raised by a

court *sua sponte*." <u>Derry v. State</u>, 358 Md. 325, 334, 748 A.2d 478, 482 (2000) (cleaned

up). <u>See also</u> Md. R. 8-131(a) ("The issue[] of jurisdiction of the trial court over the subject

matter . . . may be raised in and decided by the appellate court whether or not raised in and

decided by the trial court."). We review without deference questions of law involving

statutory interpretation. <u>See</u> <u>Gorge v. State</u>, 386 Md. 600, 610, 873 A.2d 1171, 1177

(2005).

---

[10]Black's Law Dictionary defines "*actus reus*" as "[t]he wrongful deed that comprises the physical components of a crime and that generally must be coupled with mens rea to establish criminal liability; a forbidden act" and as "[t]he voluntary act or omission, the attendant circumstances, and the social harm caused by a criminal act, all of which make up the physical components of a crime." *Actus Reus*, Black's Law Dictionary (11th ed. 2019).

**Analysis**

In agreement with the State, we conclude that Beckwitt's contention concerning the English Fires Prevention (Metropolis) Act of 1774 and earlier statutes does not raise a question of subject matter jurisdiction. We are not persuaded by Beckwitt's argument that 300-year-old statutes deprived the circuit court of subject matter jurisdiction in this case.

Subject matter jurisdiction, also called fundamental jurisdiction, see Tshiwala v. State, 424 Md. 612, 621, 37 A.3d 308, 313 (2012), "is the court's ability to adjudicate a controversy of a particular kind[,]" John A. v. Bd. of Educ. for Howard Cty., 400 Md. 363, 388, 929 A.2d 136, 151 (2007) (citation omitted). "If by that law which defines the authority of the court, a judicial body is given the power to render a judgment over that class of cases within which a particular one falls, then its action cannot be assailed for want of subject matter jurisdiction." Tshiwala, 424 Md. at 621, 37 A.3d at 313 (cleaned up). We have expressly recognized the difference between a court lacking fundamental jurisdiction and improperly exercising jurisdiction, explaining that just "[b]ecause a court or judge is unauthorized to take particular action or is erroneously exercising jurisdiction, does not mean that the court or judge does not have basic subject matter jurisdiction." Id. at 621, 37 A.3d at 313. We have explained:

> Simply because a statutory provision directs a court to decide a case in a particular way, if certain circumstances are shown, does not create an issue going to the court's subject matter jurisdiction. There have been numerous cases in this Court involving the situation where a trial court has jurisdiction over the subject matter, but where a statute directs the court, under certain circumstances, to exercise its jurisdiction in a particular way, and the tribunal erroneously refuses to do so because [of] an error of statutory interpretation or an error of fact. In these situations, this Court has regularly held that the matter did not concern the subject matter jurisdiction of the trial court.

Id. at 622, 37 A.3d at 313-14 (cleaned up).

Maryland circuit courts are courts of general jurisdiction and have "full common-law and equity powers and jurisdiction in all civil and criminal cases within [their] county[.]" Md. Code Ann., Cts. & Jud. Proc. (1974, 2020 Repl. Vol.) ("CJ") § 1-501. In criminal cases, with certain exceptions, the circuit courts have exclusive original jurisdiction over felony offenses. See CJ §§ 4-302(a), 4-301(b). The Circuit Court for Montgomery County—the circuit court in this case—plainly had subject matter jurisdiction over Beckwitt's criminal case because it had the power to render a judgment with respect to the felony offenses with which Beckwitt was charged. See Powell v. State, 324 Md. 441, 446, 597 A.2d 479, 482 (1991) (The circuit courts "are courts of original jurisdiction, authorized to hear all actions and causes, other than those particularly prescribed by statute or constitutional provision for other fora." (Citations omitted)). Beckwitt's contention that old English statutes preclude his prosecution and provide a complete defense because, according to him, the charges are based on an accidental housefire is, in actuality, an argument that the 300-year-old statutes compel the circuit court to exercise its jurisdiction in a particular way, i.e., that given the circumstances, permitting Beckwitt's prosecution was erroneous. Under Maryland law, it is clear that Beckwitt's prosecution for depraved heart murder and involuntary manslaughter was not beyond the circuit court's subject matter jurisdiction.

Because the issue raised by Beckwitt does not constitute an issue of subject matter jurisdiction, Beckwitt was required to raise the issue in the circuit court to preserve the

matter for appellate review.  See Md. R. 8-131(a) ("Ordinarily, the appellate court will not decide any other issue unless it plainly appears by the record to have been raised in or decided by the trial court[.]").  On brief, in a footnote, Beckwitt indicates that the issue is preserved because, while moving for judgment of acquittal, his attorney challenged the circuit court's "ability to enter a conviction on a common law offense that was not cognizable[.]"  In moving for judgment of acquittal, among many other things, Beckwitt's counsel stated:

> [I]f there was a common law duty to provide a safe, unobstructed egress from a single-family home, . . . that common law duty was abrogated by enactment of the Maryland State Fire Prevention Code, because the State Fire Prevention Code exempts single-family homes from its scope.  That code is codified in COMAR 29.06.01. . . . Single-family homes are specifically exempted from the code, just as smoke detector statutes . . . . So it is legally not possible to provide a basis for these charges by not providing adequate egress from a single-family home because there is no statutory or common law duty.

With these remarks, Beckwitt's counsel did not mention any old English statutes upon which he now relies, or otherwise argue, as he does now, that the statutes precluded Beckwitt's prosecution.[11]  A review of the record leads to the conclusion that Beckwitt's contention concerning the Fires Prevention (Metropolis) Act of 1774 and any other English statute precluding his conviction in this case is not preserved for appellate review.

Even if we were to reach the merits, we would conclude that old English statutes did not preclude Beckwitt's prosecution or serve as a defense.  In 1707, an English law was

_____

[11]We also note that Beckwitt did not raise the issue he now raises concerning the alleged lack of subject matter jurisdiction and applicability of old English statutes on brief in the Court of Special Appeals.

- 16 -

enacted which provided in pertinent part:

> That no Action, Suit, or Process whatsoever, shall be had, maintained, or prosecuted against any Person in whose House or Chamber any Fire shall, from and after the said first Day of May, accidentally begin, or any Recompence be made by such Person for any Damage suffered or occasioned thereby; any Law, Usage, or Custom to the contrary notwithstanding[.]

6 Ann., Ch. 31, § VI (1707) (italics omitted).[12]  Eventually, the provision was codified as part of the Fires Prevention (Metropolis) Act of 1774, which stated that "no Action, Suit, or Process whatever, shall be had, maintained, or prosecuted, against any Person in whose House, Chamber, Stable, Barn, or other Building, or on whose Estate any Fire shall, after the said twenty-fourth Day of June, accidentally begin[.]"  Fires Prevention (Metropolis) Act of 1774, 14 Geo. III, Ch. 78, § LXXXVI (italics omitted).

As the State points out, historically, there has been disagreement about the scope of liability for accidental fires and the Fires Prevention (Metropolis) Act of 1774.  In Koos v. Roth, 652 P.2d 1255, 1263 (Or. 1982), the Supreme Court of Oregon discussed the status of the common law of England in 1843 with respect to fires, explaining that "[a]n early common law action for letting one's fire escape and injure his neighbor is traced to [a]

---

[12]Section III of the statute provided in pertinent part, however:

> That if any menial or other Servant or Servants, through Negligence or Carelessness, shall fire or cause to be fired any Dwelling-house, or Out-house or House, such Servant or Servants being thereof lawfully convicted by the Oath of one or more credible Witnesses made before two or more of her Majesty's Justices of the Peace, shall forfeit and pay the Sum of one hundred Pounds unto the Churchwardens of such Parish where such Fire shall happen, to [be] distributed amongst the Sufferers by such Fire[.]

6 Ann., Ch. 31, § III (1707).

1401 report" and "applied equally to a fire set outdoors, for burning stubble in a field, as to fire in one's house." (Footnote omitted). The Court observed that in an 1894 law review article, "Wigmore treated this action as a form of absolute liability." Id. at 1264 & n.11 (footnote omitted). According to the Court, in a 1926 academic journal article, Winfield differed because a person would not have been "liable if he showed that the fire was the act of a stranger, or an act of God." Id. at 1264 & n.12 (cleaned up). In addition, although the Supreme Court of Oregon did not note this in Koos, in the 1894 law review article, Wigmore stated that, in 1712, "the responsibility for accidental fires in houses was abolished by the legislature." John H. Wigmore, *Responsibility for Tortious Acts: Its History — III*, 7 Harv. L. Rev. 441, 449 (1894) (footnotes omitted).

In a 1996 article in *The Journal of Legal Studies*, A.W. Brian Simpson discussed the "obscure" history of liability for fires, stating:

> During the eighteenth century a series of fire prevention statutes was passed; they include provisions dealing with fires which began "accidentally." In 1774 a comprehensive *Fires Prevention (Metropolis) Act* was passed; section 86 appears to assume that at common law there might be liability, possibly strict, for fires which escaped from premises but had not been deliberately kindled, but the provision is obscure. The underlying assumption seems to have been that fires which caused damage to neighbors would normally either have been deliberately kindled, and allowed by negligence to spread, or have begun through negligence, but that there might be situations where a fire was accidental in the sense that it had not spread through negligence. The Act of 1774 does not clearly indicate what the standard of liability was then supposed to be, perhaps for the reason I have explained. However, Blackstone in his *Commentaries* (1765-69) thought that the effect of the Act was to exonerate a householder from liability either for his own negligence or that of his servant. However, a servant responsible was made liable to a penalty, with imprisonment in default of payment. Since serious fires would commonly leave a potential defendant without means, tort actions may have had little value.

A.W. Brian Simpson, *Coase v. Pigou Reexamined*, 25 J. Legal Stud. 53, 76-77 (1996) (footnotes omitted).

In spite of this history, Beckwitt argues that a person cannot be prosecuted in Maryland for any crime related to an accidental housefire, seemingly without regard to any circumstances surrounding the fire. Beckwitt's contention is flawed for any number of reasons. First, Beckwitt concedes that Kilty's Report of the Statutes, the preeminent authority on the topic, concluded that the Fires Prevention (Metropolis) Act of 1774 is not applicable in Maryland.[13] Specifically, on brief, Beckwitt acknowledges: "Candidly, the

---

[13]In 1811, pursuant to a resolution of the General Assembly, William Kilty, the Chancellor of Maryland, made a report to the body concerning the English statutes applicable to the people of Maryland. Kilty's English Statutes, 1811, Vol. 143, at 1, available at https://msa.maryland.gov/megafile/msa/speccol/sc2900/sc2908/000001/000143/html/am143--1.html [https://perma.cc/R8VG-2F77]. According to the Archives of Maryland Online, the full title of the report is:

> A Report of All Such English Statutes as Existed at the Time of the First Emigration of the People of Maryland, and Which by Experience Have Been Found Applicable to Their Local and Other Circumstances; and of Such Others as Have Since Been Made in England or Great-Britain, and Have Been Introduced, Used and Practised, by the Courts of Law or Equity; and Also All Such Parts of the Same as May Be Proper to Be Introduced and Incorporated into the Body of the Statute Law of the State. Made According to the Directions of the Legislature, by William Kilty, Chancellor of Maryland. To Which Are Prefixed, an Introduction and Lists of the Statutes Which Had Not Been Found Applicable to the Circumstances of the People: with Full and Complete Indexes. Published under the Directions of the Governor and Council, Pursuant to a Resolution of the General Assembly.

Id. (some capitalization omitted). In State v. Magliano, 7 Md. App. 286, 293, 255 A.2d 470, 474 (1969), the Court of Special Appeals referred to Kilty's as "[t]he only evidence on th[e] subject" of which English statutes have been found to be applicable in Maryland.

statutes relied upon by [him] have not been found applicable by Kilty." Although Beckwitt argues that this Court is not precluded from having a different view from Kilty's,[14] we see no basis on which to diverge from the long-prevailing view that the Fires Prevention (Metropolis) Act of 1774 is not applicable in Maryland.

Even if the Fires Prevention (Metropolis) Act of 1774 were applicable in Maryland, it would not govern the outcome of this case. Beckwitt fails to appreciate that he was not convicted of second-degree depraved heart murder and involuntary manslaughter because an accidental fire occurred in the basement of his house. Rather, he was convicted because the evidence demonstrated that Beckwitt had created conditions in the basement that severely impeded Khafra's ability to report and escape from any potentially life-threatening situation, which manifested a reckless or wanton disregard for Khafra's life.

There is nothing novel about an individual being prosecuted and convicted for a death resulting from an accidental fire where the individual created conditions that caused the death. For instance, in Commonwealth v. Skufca, 321 A.2d 889, 891, 893-94 (Pa. 1974), the Supreme Court of Pennsylvania affirmed a defendant's conviction for involuntary manslaughter where the defendant locked her two young children in a room, without supervision, for several hours, and a fire started in the building. A visitor was prevented from rescuing the children due to the locked door, and the children died of smoke

_____

[14]Beckwitt points to a footnote in Magliano, 7 Md. App. at 293 n.5, 255 A.2d at 474 n.5, in which the Court of Special Appeals stated: "That Kilty did not regard a statute as 'applicable' did not preclude a court from having a different view." Significantly, the Court of Special Appeals noted that one scholar had "found only two cases, however, in which Kilty's opinion was overruled[.]" Id. at 293 n.5, 255 A.2d at 474 n.5 (citations omitted).

inhalation. See id. at 891, 893. In Johnson v. State, 801 S.E.2d 294, 295-96 (Ga. Ct. App. 2017), the Court of Appeals of Georgia affirmed a defendant's convictions for involuntary manslaughter where the defendant left three of her children alone in a room with a space heater and blocked the apartment's hallway with a sofa and access to the kitchen with a table, and the space heater caught fire and two of the children died of smoke inhalation. In Commonwealth v. Levesque, 766 N.E.2d 50, 53 (Mass. 2002), the Supreme Judicial Court of Massachusetts concluded that evidence before the grand jury was sufficient to support the defendants' prosecution for manslaughter where the defendants accidentally started and failed to report a fire in a warehouse, which took the lives of six firefighters.

In the cases discussed above, the *actus reus* supporting the criminal charges was not the setting of a fire or that an accidental fire occurred. Rather, the *actus reus* was the creation of dangerous circumstances surrounding the fire, such as preventing young children from being rescued or starting and failing to report a fire thereby placing firefighters in danger. Such conduct supported criminal culpability. The same can be said of the conduct in this case, where Beckwitt arranged for Khafra to live and work in a basement with a faulty source of electrical power for the provision of light and ventilation and with no way for Khafra to immediately communicate with him in the event of an emergency and with the basement filled with trash and debris which severely impeded Khafra's ability to escape the basement in the event of an emergency. Beckwitt was not charged, tried, and convicted based on the circumstance that an accidental fire occurred in the basement of his house. Beckwitt was charged, tried, and convicted based on his conduct in creating dangerous conditions from which Khafra could not escape in the event of an

emergency such as a fire. So, even if the Fires Prevention (Metropolis) Act of 1774 applied in Maryland, it would not preclude Beckwitt's prosecution or otherwise serve as a defense because the charges in this case were not based on Khafra having lost his life in an accidental fire but rather on Beckwitt's conduct in subjecting Khafra, in wanton and reckless disregard for his life, to the dangerous conditions that caused his death.

## II. Involuntary Manslaughter

### The Parties' Contentions

Beckwitt contends that the evidence was insufficient to support a conviction for involuntary manslaughter under either a theory of gross negligence or a theory of legal duty. Beckwitt argues that the State failed to demonstrate that his conduct demonstrated a wanton and reckless disregard for human life, *i.e.*, that his conduct rose to the level of gross negligence. Beckwitt maintains that having a person work in a home with hoarding conditions and power outages is not likely to cause harm to the person, and that hoarding is not inherently dangerous conduct. Beckwitt asserts that there was no legal duty applicable to the circumstances of the case and that the jury instruction regarding the duty to provide a safe workplace failed to take into account that such a duty does not "encompass providing emergency egress in the event of an accidental fire" or "providing a smoke alarm." Beckwitt also argues that the State failed to provide sufficient evidence establishing both actual and legal causation.

The State responds that the involuntary manslaughter conviction can be reversed only if there was insufficient evidence under both the legal duty and gross negligence theories. The State maintains that Beckwitt's conduct demonstrated a reckless and wanton

disregard for Khafra's life and was grossly negligent, and that Beckwitt failed to perform his legal duty to provide Khafra with a reasonably safe work environment, a duty which any employer owes to an employee.  The State contends that both legal and actual causation are satisfied as Khafra's death would not have occurred but for Beckwitt's conduct and his death was a reasonably foreseeable consequence of such conduct.

## Standard of Review

In State v. Wilson, 471 Md. 136, 159, 240 A.3d 1140, 1153 (2020), we described the standard of review of the sufficiency of evidence as follows:

> In determining whether the evidence is legally sufficient, we examine the record solely to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.  In examining the record, we view the State's evidence, including all reasonable inferences to be drawn therefrom, in the light most favorable to the State.

(Cleaned up).  In reviewing the evidence, we consider "whether the verdict was supported by sufficient evidence, direct or circumstantial, which could convince a rational trier of fact of the defendant's guilt of the offenses charged beyond a reasonable doubt." White v. State, 363 Md. 150, 162, 767 A.2d 855, 862 (2001) (citation omitted).  "Circumstantial evidence may support a conviction if the circumstances, taken together, do not require the trier of fact to resort to speculation or conjecture, but circumstantial evidence which merely arouses suspicion or leaves room for conjecture is obviously insufficient." Smith v. State, 415 Md. 174, 185, 999 A.2d 986, 992 (2010) (cleaned up).  "It must afford the basis for an inference of guilt beyond a reasonable doubt." Id. at 185, 999 A.2d at 992 (cleaned up).

## Involuntary Manslaughter Generally

In Maryland, involuntary manslaughter is a common law felony generally defined

- 23 -

as "the unintentional killing of a human being, irrespective of malice." State v. Thomas, 464 Md. 133, 152, 211 A.3d 274, 285 (2019) (citation omitted). There are three varieties or theories of involuntary manslaughter: "(1) unlawful act manslaughter—doing some unlawful act endangering life but which does not amount to a felony; (2) gross negligence manslaughter—negligently doing some act lawful in itself; and (3) the negligent omission to perform a legal duty." Id. at 152, 211 A.3d at 285 (cleaned up). For the latter two variations of involuntary manslaughter—gross negligence and negligent omission to perform legal duty—"the negligence must be criminally culpable[,] i.e., grossly negligent." Id. at 152, 211 A.3d at 285 (cleaned up).

In addition, the State must "demonstrate a causal connection between such gross negligence and death to support a conviction, although it is not essential that the ultimate harm which resulted was foreseen or intended." Id. at 152, 211 A.3d at 285 (cleaned up). The causal connection "includes actual, but-for causation and legal causation." Id. at 152, 211 A.3d at 285; see also id. at 173, 211 A.3d at 297-98 ("[T]he defendant's gross negligence must be the proximate cause of the victim's death—meaning the (1) actual, but-for cause and (2) legal cause." (Cleaned up)). "[A]ctual cause, or cause-in-fact, concerns the threshold inquiry of whether [the] defendant's conduct actually produced an injury." McCauley v. State, 245 Md. App. 562, 575, 227 A.3d 656, 663 (2020) (cleaned up). "For conduct to be the actual cause of some result, it is almost always sufficient that the result would not have happened in the absence of the conduct—or 'but for' the defendant's actions." Thomas, 464 Md. at 174, 211 A.3d at 298 (cleaned up).

As to actual causation in gross negligence involuntary manslaughter cases, in

Thomas, we observed that on only a few occasions have Maryland cases "evaluated the actual, or but-for, cause of a given result[.]" Id. at 174-75, 211 A.3d at 298. We discussed one instance, stating:

> In one such case, the Court of Special Appeals determined that a mutual agreement to engage in grossly negligent conduct can be sufficient to find causation, even where the victim was, himself, engaged in the grossly negligent act. In *Goldring v. State*, 103 Md. App. 728, 730-31, 654 A.2d 939[, 940] (1995), two racers, Hall and Goldring, participated in a drag race on a two-lane country highway with a posted 45-mile-per-hour speed limit. During the race, Hall accidently struck the side of Goldring's vehicle and lost control of his car. *See id.* at 731, 654 A.2d [at 940]. Hall and two pedestrians were killed. *See id.* The court concluded that Goldring's conduct in competing in the drag race bore a sufficiently direct causal connection to Hall's death to support Goldring's conviction for involuntary manslaughter, and Goldring was convicted in the death of Hall and the two pedestrians. *See id.* at 738, 654 A.2d [at 944].

Thomas, 464 Md. at 175, 211 A.3d at 298-99.

In Thomas, id. at 175, 211 A.3d at 299, we also discussed Palmer v. State, 223 Md. 341, 353, 164 A.2d 467, 474 (1960)—a case in which we stated "that a defendant does not 'cease to be responsible for his otherwise criminal conduct because there were other conditions which contributed to the same result.'" Specifically, we stated:

> In *Palmer*, we held a mother liable for gross negligence involuntary manslaughter when she failed to prevent her husband's savage beatings of her daughter. Significantly, the Court concluded that it was not necessary that the mother's grossly negligent conduct be the sole reason for her daughter's death. *See Palmer*, 223 Md. at 353, 164 A.2d [at 474]. Ultimately, her unwillingness to aid her child, which was her duty, resulted in the child's death and she, too, could be convicted of involuntary manslaughter. Thus, we took a broader view of actual cause, implicitly recognizing that the grossly negligent conduct need only be the but-for cause of the death, and not an independently sufficient cause of it.

Thomas, 464 Md. at 175, 211 A.3d at 299.

- 25 -

In Thomas, id. at 178, 211 A.3d at 301, we explained that "[t]he concept of legal causation is applicable in both criminal and tort law, and the analysis is parallel in many instances" and "turns largely upon the foreseeability of the consequences of the defendant's conduct." (Cleaned up). The State is not required to prove "that the ultimate harm which resulted was actually foreseen or intended." Id. at 178, 211 A.3d at 301 (cleaned up). Rather, "[i]t is sufficient that the ultimate harm is one which a reasonable man would foresee as being reasonably related to the acts of the defendant." Id. at 178, 211 A.3d at 301 (cleaned up).

**Gross Negligence Involuntary Manslaughter**

With respect to gross negligence involuntary manslaughter, the State must prove that the defendant's conduct that resulted in the victim's death, "under the circumstances, amounted to a disregard of the consequences which might ensue and indifference to the rights of others, and so was a wanton and reckless disregard for human life." State v. Albrecht, 336 Md. 475, 500, 649 A.2d 336, 348 (1994) (cleaned up). The defendant "must have committed acts so heedless and incautious as necessarily to be deemed unlawful and wanton[.]" Id. at 500, 649 A.2d at 348 (cleaned up). "The act must manifest such a gross departure from what would be the conduct of an ordinarily careful and prudent person under the same circumstances so as to furnish evidence of indifference to the consequences." Thomas, 464 Md. at 153, 211 A.3d at 286 (cleaned up). "Moreover, the defendant, or an ordinarily prudent person under similar circumstances, should be conscious of this risk." Id. at 154, 211 A.3d at 286 (citations omitted). In Thomas, id. at 160-61, 211 A.3d at 290, we explained that, in addition to the above considerations,

determining whether an individual's conduct constitutes gross negligence

> also involves an assessment of whether an activity is more or less likely at any moment to bring harm to another, as determined by weighing the inherent dangerousness of the act and environmental risk factors. This weighing must amount to a high degree of risk to human life—falling somewhere between the unreasonable risk of ordinary negligence and the very high degree of risk necessary for depraved-heart murder.

(Cleaned up).

Whether a defendant's conduct rises to the level of gross negligence is a fact-specific inquiry and "[t]here is no scientific test or quantifiable probability of death that converts ordinary negligence to criminal gross negligence." Id. at 159, 211 A.3d at 289. Instead, "the inherent dangerousness of the act engaged in, as judged by a reasonable person[,] . . . is combined with environmental risk factors, which, together, make the particular activity more or less likely at any moment to bring about harm to another." Id. at 159, 211 A.3d at 289 (cleaned up). The inquiry into gross negligence is not limited to an assessment of inherent dangerousness and environmental factors; "the defendant, or an ordinarily prudent person under similar circumstances, should be conscious of the risk to others." Id. at 167, 211 A.3d at 294 (citation omitted).

We have indicated that gross negligence involuntary manslaughter generally occurs "in four main contexts: automobiles, police officers, failure to perform a duty, and weapons." Id. at 154, 211 A.3d at 286. In Thomas, in considering "under what circumstances the dangers of heroin would justify holding a dealer liable for involuntary manslaughter for supplying the means by which his customer fatally overdoses[,]" we discussed cases involving automobiles, police officers, and weapons to "create a helpful

tableau depicting how we assess a defendant's level of negligence." Id. at 139, 154, 211

A.3d at 277, 286.[15]

In the context of automobiles and gross negligence,[16] we observed that, in Duren v.

State, 203 Md. 584, 588-90, 102 A.2d 277, 279-80 (1954), a defendant's conduct

constituted gross negligence where the defendant operated a vehicle in a reckless manner

by speeding in a heavily congested residential and business area and struck and killed a

pedestrian. See Thomas, 464 Md. at 154-55, 211 A.3d at 286-87. In State v. Kramer, 318

Md. 576, 586-89, 592-93, 569 A.2d 674, 679-82 (1990), we held that the evidence was

sufficient to support a jury's finding that the defendant's conduct constituted gross

negligence where the defendant while driving in a rural area passed vehicles in a no-pass

zone going at least 75 miles per hour, while talking and joking with passengers, and hit an

oncoming vehicle, killing an occupant. See Thomas, 464 Md. at 155-56, 211 A.3d at 287.

By contrast, in Johnson v. State, 213 Md. 527, 529-30, 132 A.2d 853, 854, 856 (1957), we

concluded that the evidence was not sufficient to support a conviction for manslaughter by

vehicle where the defendant, who was driving in a non-residential area early in the

morning, hit a curb, side-swiped a pole, and ended up in a plot of grass, causing a passenger

to be ejected from the car and killed. See Thomas, 464 Md. at 156-57, 211 A.3d at 287-

---

[15]Although we recognized that involuntary manslaughter could involve a failure to perform a duty, in Thomas we did not discuss this line of cases.

[16]In Thomas, 464 Md. at 154, 211 A.3d at 286, although we recognized that a criminal statute for "manslaughter by vehicle"—defined "as causing the death of another by driving, operating, or controlling a vehicle in a grossly negligent manner"—"preempts any prosecution for such conduct as common law gross negligence manslaughter," the cases involving manslaughter by vehicle were relevant because they involve "the same common law concept and meaning of gross negligence[.]" (Cleaned up).

88. At trial, there was contradictory testimony about the speed at which the car had been going. See id. at 156, 211 A.3d at 287. Looking at environmental factors such as "the type of road traveled, the time of day, the traffic, the density and character of the neighborhood, and any safety precautions or warnings disregarded," we "determined that there was insufficient evidence to conclude that the defendant was grossly negligent." Id. at 156-57, 211 A.3d at 287-88 (citations omitted).

In Thomas, we also discussed gross negligence involuntary manslaughter cases involving negligent police officer conduct that resulted in death. See id. at 157, 211 A.3d at 288. Although "such cases are evaluated under a heightened 'reasonable police officer under the circumstances' standard, rather than a reasonably prudent person standard[,]" we noted that the cases provided "guidance concerning the line between ordinary and gross negligence." Id. at 157, 211 A.3d at 288 (citation omitted). In Albrecht, 336 Md. at 478, 480-82, 649 A.2d 337-39, we held that the evidence was sufficient to support a conviction for gross negligence involuntary manslaughter where an officer removed a shotgun from his vehicle, racked the gun, leveled it at the victim, and, with his finger on the trigger, intended to swing the shotgun to aim it at another person, but instead the gun discharged, and the victim was killed. See Thomas, 464 Md. at 157-58, 211 A.3d at 288.

Lastly, in Thomas, we discussed Mills v. State, 13 Md. App. 196, 197, 282 A.2d 147, 147 (1971), a case in which a sixteen-year-old defendant took his father's gun with him to a school dance, then went into a bathroom with friends to look at the gun and drink liquor. See Thomas, 464 Md. at 159, 211 A.3d at 289. The defendant, who knew there was one bullet in the chamber, pointed the gun at his friend, who slapped the gun from the

defendant's hand, causing it to hit the floor, discharge, and kill another boy.  See id. at 159, 211 A.3d at 289.  The Court of Special Appeals concluded "that the circumstances plainly demonstrated a grossly negligent act dangerous to life" and that "the friend's reaction when the gun was pointed in his direction was wholly predictable, and therefore not an independent supervening cause."  Id. at 159, 211 A.3d at 289 (cleaned up).

After reviewing the cases discussed above, in Thomas, we concluded that the defendant's conduct demonstrated a wanton and reckless disregard for human life and that the evidence was sufficient to support a conviction for gross negligence manslaughter.  See id. at 171-72, 211 A.3d at 296-97.  The agreed findings of fact in the case showed that the victim, a twenty-three-year-old man, died of a heroin overdose.  See id. at 141, 147, 211 A.3d at 278-79, 282.  The defendant, a heroin dealer and user, would consume twelve bags of heroin a day, using four bags for a single shot, and would travel to Delaware every two to three days to get his supply of heroin.  See id. at 148, 211 A.3d at 283.  The defendant had sold heroin to the victim a few times.  See id. at 149, 211 A.3d at 283.  In the hours before he was found dead in the early morning, the victim called the defendant approximately twenty-seven times over the course of twenty-two minutes and, during the same time span, the victim text messaged the defendant five times.  See id. at 145, 169, 211 A.3d at 280-81, 295.  This was unusual behavior because the defendant usually met the victim earlier in the day to sell him heroin.  See id. at 149, 211 A.3d at 283.  The defendant met with the victim and sold him four bags of heroin—the only time he sold heroin to the victim around midnight.  See id. at 149, 211 A.3d at 283.

In Thomas, we considered "the inherent dangerousness of distributing heroin with

the attendant environmental risk factors presented[,]" and observed that, according to the agreed statement of facts, anyone in the defendant's position—who was knowingly engaged in the unregulated selling of a controlled dangerous substance to customers in a region suffering from an epidemic of heroin and opioid abuse and deaths—"would understand the dangers of heroin, and its propensity to harm physically, if not kill, individuals who are ingesting it." Id. at 167, 211 A.3d at 294 (cleaned up). We determined that it was "fair to infer that [the defendant] subjectively knew an overdose was possible based on his statement that [the victim] 'couldn't have overdosed off [the amount] I sold him.'" Id. at 168, 211 A.3d at 295 (last alteration in original). We concluded that "the consumption of heroin in unknown strength is dangerous to human life, and the administering of such a drug is inherently dangerous[,]" although "distribution, alone, does not always amount to gross negligence." Id. at 169, 211 A.3d at 295 (cleaned up).

We noted that the defendant was a "systematic and sustained heroin distributor[,]" who also abused heroin himself, not an "infrequent or inexperienced provider." Id. at 170, 211 A.3d at 295. From this, we stated that it could be inferred that the defendant "was aware of the risk to life posed by consistent heroin abuse, cognizant of its ill-effects, and, yet, continued to sell the drug notwithstanding its danger." Id. at 170, 211 A.3d at 296 (citations omitted). We concluded that the defendant's conduct constituted a wanton and reckless disregard for human life and that the evidence was sufficient to support the defendant's conviction for gross negligence manslaughter beyond a reasonable doubt. See id. at 171-72, 211 A.3d at 296-97.

As to causation, we concluded that the defendant's conduct—selling four bags of

heroin to the victim, who consumed them—was sufficient to establish actual, but-for causation, stating: "There is no evidence in the record that [the victim] could have died without the heroin, and this is enough to find but-for causation." Id. at 178, 211 A.3d at 300 (citation omitted). We also concluded that there was sufficient evidence of legal causation. See id. at 180, 211 A.3d at 301. We explained that the State was not required to prove "that the four bags of heroin were the only reason [the victim] overdosed and died." Id. at 180, 211 A.3d at 301. We stated that "[r]ather, there must be sufficient evidence in the record to determine that [the victim] would not have died but for the heroin and that his death was a foreseeable consequence of [the defendant] selling him the four bags of heroin[,]" which the State had established. Id. at 180, 211 A.3d at 301.

In State v. Morrison, 470 Md. 86, 94-95, 233 A.3d 136, 141 (2020), this Court held that the evidence was not sufficient to support a mother's convictions for gross negligence involuntary manslaughter and reckless endangerment where a mother co-slept with her four-month-old infant and her four-year-old daughter, after an evening of drinking beer with friends virtually, and the infant died as a result of asphyxia from probable overlay. 470 Md. at 94-95, 233 A.3d at 141. We concluded that the mother did not engage in inherently dangerous conduct and we observed that the State did not introduce evidence that the mother was aware of the risks associated with co-sleeping "or that a reasonable person under the circumstances would have appreciated those risks." Id. at 115, 233 A.3d at 153. Although the evidence showed that the mother had consumed alcohol, there was insufficient evidence to support a finding that she was intoxicated or impaired on the night her infant died. See id. at 121, 233 A.3d at 157. In sum, we concluded that "there was

insufficient evidence of gross negligence—wanton and reckless disregard for human life—"and that "the conviction for involuntary manslaughter was properly reversed." Id. at 124, 233 A.3d at 158.

**Legal Duty Involuntary Manslaughter**

In Maryland, it is a longstanding principle that an employer owes an employee the duty to provide a reasonably safe place to work. See, e.g., Athas v. Hill, 300 Md. 133, 139, 476 A.2d 710, 713 (1984) ("Among the nondelegable duties which the employer owed his employees was the duty to provide a safe place to work[.]" (Citations omitted)).

In State v. DiGennaro, 415 Md. 551, 564-65, 3 A.3d 1201, 1208-09 (2010), this Court discussed whether a defendant could have been convicted of involuntary manslaughter under a legal duty theory where the victim's death was not caused by the defendant's negligent operation of a vehicle, but rather by the failure to clear a roadway of debris that fell from his dump truck. The Court of Special Appeals had reversed the defendant's conviction for manslaughter by vehicle and we affirmed, holding that the definition of the term "operating" in the manslaughter by vehicle statute is synonymous with the definitions of "drive" and "operate" in the Transportation Article, such "that a defendant cannot be convicted of manslaughter by vehicle unless the victim died as a result of grossly negligent conduct that occurred while the defendant was actually operating a vehicle." Id. at 553-54, 563-64, 3 A.3d at 1202, 1208. Although the defendant had not been charged with legal duty involuntary manslaughter, we discussed whether he could have been convicted of the offense. See id. at 564-67, 3 A.3d at 1208-10. We stated:

> To convict a defendant of involuntary manslaughter by grossly

negligent failure to perform a legal duty, the State must prove beyond a reasonable doubt that (1) the victim's death was caused by the defendant's failure to perform a duty that the defendant had a legal obligation to perform, and (2) the defendant acted in a grossly negligent manner because the defendant (a) was aware of his or her obligation to perform that duty, and (b) was aware that his or her failure to perform that duty would create a high degree of risk to human life.

DiGennaro, 415 Md. at 566, 3 A.3d at 1210 (citations omitted).

We explained that the defendant could have been convicted of legal duty involuntary manslaughter if the State proved beyond a reasonable doubt that:

(1) even though his operation of the vehicle was neither reckless nor negligent, as a result of what occurred while he had been operating that vehicle, [the statute] imposed upon him a duty to take appropriate remedial measures on behalf of other users of the highway; (2) he failed to perform that duty with reckless indifference to the issue of whether his inaction was endangering other users of [the road]; and (3) under the circumstances, that failure constituted gross negligence.

Id. at 564-65, 3 A.3d at 1208-09 (footnotes omitted).

**Analysis**

We hold that the evidence was sufficient to support Beckwitt's conviction for involuntary manslaughter under either a gross negligence or legal duty theory.[17]   In assessing the sufficiency of the evidence to support a conviction for gross negligence involuntary manslaughter, we must determine whether Beckwitt acted with the *mens rea* necessary to establish gross negligence, *i.e.*, whether he acted with wanton and reckless

---

[17]In this case, the jury was instructed on both the gross negligence and failure to perform a legal duty type of involuntary manslaughter.  The verdict sheet did not contain a separate question requiring the jury to choose between the two theories or otherwise differentiate between the two theories.  When the jury returned its verdict, it returned a general verdict of guilty as to involuntary manslaughter.

disregard for Khafra's life. This involves a determination as to whether Beckwitt's conduct departed from that of an ordinarily careful and prudent person and demonstrated a disregard of the consequences to Khafra. It also requires an assessment of whether Beckwitt's conduct was likely to bring harm at any moment, *i.e.*, whether the inherent dangerousness of the conduct combined with environmental risk factors together made the conduct more or less likely at any moment to result in harm to Khafra. See Thomas, 464 Md. at 160-61, 211 A.3d at 290.

Applying this framework, we conclude that the evidence was sufficient to establish gross negligence involuntary manslaughter because Beckwitt's conduct constituted a departure from the conduct that any reasonable person would have taken under the circumstances and demonstrated a disregard of the consequences to Khafra. On multiple levels, Beckwitt's conduct constituted a departure from the conduct that a reasonable person would have engaged in under similar circumstances. No reasonable person would have required Khafra to live and work in a basement with a faulty supply of electricity for light and airflow and without a reliable way for Khafra to contact him. No reasonable person would have maintained the abhorrent conditions that existed in the basement with debris and trash blocking Khafra's route out in the event of an emergency. And no reasonable person would have reacted as casually as Beckwitt did on the day of the fire upon learning of the two power outages in the basement.

Beckwitt's conduct was likely to bring harm to Khafra at any moment and an ordinarily prudent person under similar circumstances would have been conscious of the risk to Khafra. See Thomas, 464 Md. at 160-61, 211 A.3d at 290. Beckwitt's conduct,

accompanied by other circumstances, presented a risk of danger to Khafra. Specifically, the combination of Beckwitt's conduct and environmental risk factors that he created in the basement produced a substantial risk of harm to Khafra—namely, that he would not be able to escape from the basement in the event of a fire or any other emergency. Beckwitt hired Khafra, a young man with no construction experience, to live underground for weeks at a time and dig tunnels beneath his home in conditions that could only be described as extraordinarily unsafe, *i.e.*, dangerous. Electricity to the tunnels was provided by multiple extension cords and power strips that had a history of failing and making the circuit breaker trip. In response to power outages, Beckwitt would switch the power to a different circuit or wait, believing that the circuit breaker might reset itself, and replace extension cords rather than make any meaningful improvement to the electricity source. A loss of electricity would result in a loss of both light and ventilation in the tunnels. The failure to provide reliable electricity alone constituted conduct on Beckwitt's part that created a dangerous condition and an environmental risk factor that made it likely that working in the basement could result in harm to Khafra at any moment and created a risk that any reasonable person would have been aware of. An ordinarily prudent person would know that causing someone to live and work in a basement in which there could be power outages that result in a lack of light and airflow would create circumstances, *i.e.*, risk factors, that could prevent the person from escaping the basement in the event of an emergency.

The evidence showed that Beckwitt engaged in conduct that increased the risk of harm by causing Khafra to work in the basement with no reliable way to contact him in the event that he was injured or needed to leave the basement in an emergency. Beckwitt did

not have a cell phone or landline telephone and Khafra could reach him only through an internet messaging app. The unreliability of this method of communication was demonstrated when in the early morning hours on September 10, 2017, the power first went out, and Khafra messaged Beckwitt stating that there was no power and that there was smoke in the basement; Beckwitt did not see the messages until over six hours later when he woke up.

Compounding the risk was the circumstance that Khafra did not know his exact location if he needed to call for assistance in an emergency. Beckwitt took deliberate steps to conceal the location of his house. The evidence at trial showed that Beckwitt actively sought to hide his address from Khafra and Hart, another person whom Beckwitt hired to dig in his basement. In transit to the home, Beckwitt required Hart to wear sunglasses with duct tape on them and he required Khafra to be blindfolded, all to obstruct Hart's and Khafra's vision when Beckwitt drove them to the house. Although Khafra eventually learned that Beckwitt lived in Bethesda, Beckwitt had nevertheless attempted to conceal the fact. And although Khafra learned that the house was in Bethesda, he did not know— and could not know—his exact location because Beckwitt used a virtual private network such that, had Khafra tried to use his cell phone's location services while connected to Beckwitt's network, it would have appeared as if Khafra were in Virginia. These circumstances obviously would have impeded Khafra's ability to call for help in the event of an emergency and are circumstances that an ordinarily prudent person would have known presented a risk of harm.

Adding to the dangerous conditions and environmental risk factors created by

Beckwitt, the basement was filled with a large amount of trash, construction debris, and other items. Indeed, the basement was so full of trash and debris that it took over twenty firefighters, working eight- to ten-hour days, several weeks to clear it out. The detritus in the basement was piled six to seven feet tall, creating a wall of materials on either side of narrow pathways, which themselves were obstructed with items. To move around in the basement, a person was required to squeeze through the pathways, sometimes crawling, pushing, and moving debris to proceed, and walking on trash that was piled approximately one-and-a-half to two feet high.

The situation in the tunnels (the area in the basement in which Khafra would dig) was so dangerous that a fire investigator, Lieutenant Erin Wirth of Montgomery County Fire Rescue, a witness for the State, testified that she responded to the scene the day after Khafra's death and was equipped with a mask that covered her entire face, an air line to oxygen tanks outside the house, a small oxygen tank on her person, and a safety harness, but she refused to crawl to the end of the tunnels because she did not feel it was safe to do so.[18] According to Daniel Maxwell, a fire origin and cause investigator for NEFCO Fire Investigations, who testified as an expert witness for the State, escape from the fire in the basement would have been very difficult given the trash and debris in the basement. Maxwell testified that people escaping a fire "instinctive[ly]" get close to the floor to get below the "layer of hot air and gases." Maxwell testified that getting down and crawling

---

[18]Lieutenant Wirth testified that the conditions were unsafe for her to go to the end of the tunnels "[n]ot just because of shoring and dirt and all of that, but also the water that had come down from the firefighting."

through Beckwitt's basement would have been difficult, though, because Khafra would have had "to crawl over all the debris, all the buckets and the bags of cement and all the other" items in the basement. Based on Lieutenant Wirth's and Maxwell's testimony, any rational trier of fact could have concluded that, given the amount of debris in the basement, Khafra's ability to move through the basement was impeded to the point that he ran out of time to escape the fire. In other words, a rational trier of fact could have determined that Beckwitt created conditions in the basement that prevented Khafra's ability to get out.

We are wholly unpersuaded by Beckwitt's contention that "Khafra's mode of egress was reasonable under the circumstances" and that "Khafra was not prevented from escaping the basement[,]" but rather was simply "slowed down by the hoarding conditions." (Cleaned up). Based on the evidence, the jury reasonably could have concluded that the conditions that Beckwitt maintained in the basement impeded Khafra's escape to the extent that Khafra was unable to get out of the basement during the fire. In evaluating the sufficiency of the evidence, our duty is to "examine the record solely to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Wilson, 471 Md. at 159, 240 A.3d at 1153 (cleaned up). "We defer to any possible reasonable inferences the jury could have drawn from the admitted evidence and need not decide whether the jury could have drawn other inferences from the evidence, refused to draw inferences, or whether we would have drawn different inferences from the evidence." Fuentes v. State, 454 Md. 296, 308, 164 A.3d 265, 272 (2017) (citations omitted).

In this case, on top of all of the other circumstances, the evidence demonstrated that

living conditions in the basement were atrocious and that, while in the basement, Khafra was entirely reliant on Beckwitt for food, basic hygiene, and escape. There were no toilet facilities. Khafra urinated and defecated in a bucket that Beckwitt emptied every few days. Khafra cleaned himself using disposable wipes. On the day of the fire, Khafra was found dead in the tunnels, wearing no clothes.

In addition to the hazardous conditions he established in the basement, Beckwitt's conduct on the day of the fire demonstrated an indifference to or disregard of the consequences that might befall Khafra as a result of the power outages. Khafra messaged Beckwitt early in the morning on September 10, 2017, beginning at 2:32 a.m., alerting him to a power outage, at 2:37 a.m., advising of smoke in the tunnels, and at 2:51 a.m. about the darkness and lack of airflow. Beckwitt did not see the messages until he woke up over six hours later, at approximately 9:00 a.m. After Beckwitt awoke and finally saw Khafra's three messages, despite the content of the messages, he did not respond until 9:27 a.m., almost a half hour later. At that time, instead of checking on Khafra or getting Khafra out of the basement right away, Beckwitt responded by simply telling Khafra that there had been a "pretty major electrical failure" and that his solution was to "switch[] it all over to a different circuit." Beckwitt then went back to sleep for over five hours. Later that day, at around 4:00 p.m., Beckwitt heard the carbon monoxide alarm beep. Beckwitt understood the beeping sound to be an indication of another loss of power, which was confirmed when he did not hear the refrigerator running anymore. Despite there being another loss of power and knowing from Khafra's earlier messages that the previous power outage had resulted in Khafra being in the dark with no airflow, Beckwitt waited twenty to thirty minutes before

going to investigate the outage and reset the circuit breaker in the basement. As Beckwitt was leaving the basement, he heard an explosion, saw smoke, and became aware that the fire had started.

From the evidence produced at trial, the jury reasonably could have concluded that on the day of the fire when Beckwitt finally went to the basement to reset the circuit breaker as a result of the second power outage, he knew the following: Khafra was alone in the basement with trash and debris obstructing his ability to get out; electrical power to the basement was supplied by a series of extension cords and power strips and was unreliable; there had been two power outages in the span of just over twelve hours, one of which he himself described as a "pretty major electrical failure"; Khafra had thought he smelled smoke in the basement during the night; and, Khafra had been without electrical power in the morning and had told him that there was no airflow or light in the basement. Yet, despite knowing all of this, Beckwitt did not take any steps to have Khafra leave the basement earlier in the day before the fire and did not respond promptly to the second power outage that immediately preceded the fire. Beckwitt's conduct on the day of the fire and overall conduct in creating unsafe conditions in the basement placed Khafra in a position in which he would have been at a high risk of harm during a fire or other emergency. The evidence was sufficient to demonstrate that Beckwitt possessed enough information to be aware of the risk of harm to Khafra and that on the day of the fire, he disregarded the risk or, at the very least, was indifferent to it. An ordinarily prudent person would have been aware of the risk of harm to Khafra under the circumstances.

In this case, with certainty, viewing the evidence in the light most favorable to the

State, any rational juror could have concluded beyond a reasonable doubt, based on evidence of the dangerous conditions that Beckwitt created in the basement and his disregard for Khafra's safety on the day of the fire, that his "conduct amounted to a wanton and reckless disregard for human life—a gross departure from the conduct of an ordinarily prudent person, without regard to the consequences or the rights of others, and [was] likely to bring harm at any moment." Thomas, 464 Md. at 171, 211 A.3d at 296 (cleaned up). Beckwitt not only departed from conduct that a reasonable person would have taken under similar circumstances but also demonstrated both a disregard of the consequences which might ensue and an indifference to Khafra's well-being, and so evinced a wanton and reckless disregard for Khafra's life. In sum, the evidence was sufficient for a rational trier of fact to find that Beckwitt's conduct was grossly negligent.

Because we conclude that the evidence was sufficient to support Beckwitt's conviction for involuntary manslaughter under a gross negligence theory, we need not necessarily consider whether the evidence was also sufficient to support a conviction under the legal duty theory of involuntary manslaughter.[19] To dispel any remaining question

---

[19]In Griffin v. United States, 502 U.S. 46, 47, 49 (1991), in considering "whether, in a federal prosecution, a general guilty verdict on a multiple-object conspiracy charge must be set aside if the evidence is inadequate to support conviction as to one of the objects[,]" the Supreme Court stated that it was a well-settled rule of criminal procedure "that a general jury verdict was valid so long as it was legally supportable on one of the submitted grounds[.]" The Supreme Court further stated:

It is one thing to negate a verdict that, while supported by evidence, may have been based on an erroneous view of the law; it is another to do so merely on the chance—remote, it seems to us—that the jury convicted on a ground

concerning the sufficiency of the evidence for Beckwitt's conviction for involuntary manslaughter, however, we address the issue and determine that the evidence was sufficient for the jury to have found beyond a reasonable doubt that Beckwitt failed to fulfill the legal duty to provide Khafra with a reasonably safe work environment and that the failure to do so was grossly negligent. To be sure, no Maryland case has directly addressed whether an employer may be convicted of involuntary manslaughter under a legal duty theory. Maryland law is clear, though, that employers have a common law duty to provide employees with a reasonably safe work environment. See Athas, 300 Md. at 139, 476 A.2d at 713. The evidence was sufficient to support a conviction for legal duty involuntary manslaughter as long as the State proved beyond a reasonable doubt that Beckwitt was Khafra's employer, that Beckwitt failed to fulfill the duty to provide a reasonably safe workplace with reckless indifference as to whether his inaction endangered Khafra, and that, under the circumstances involved, the failure constituted gross negligence. Cf. DiGennaro, 415 Md. at 564-65, 3 A.3d at 1208-09.

In this case, the evidence was sufficient for the jury to conclude that Beckwitt was Khafra's employer. Beckwitt paid Khafra $150 per day to live in the basement and dig tunnels. As such, in accord with Maryland law, as his employer, Beckwitt owed Khafra the duty of providing a reasonably safe work environment. Based on the evidence concerning the conditions that Beckwitt created and allowed to persist in the basement,

---

that was not supported by adequate evidence when there existed alternative grounds for which evidence was insufficient.

Id. at 59-60 (cleaned up).

there was more than sufficient evidence for a reasonable jury to conclude that Beckwitt failed miserably in fulfilling the duty to provide Khafra a reasonably safe work environment.

Beckwitt's contention that he had no common law duty to install a smoke detector or to provide emergency exit in case of an accidental fire is nothing more than a distraction.[20]  The installation of a smoke detector or having a designated emergency exit are but two measures that Beckwitt could have taken to establish a reasonably safe workplace.  The evidence was sufficient to prove that Beckwitt failed in numerous ways to fulfill the duty to provide Khafra with a reasonably safe workplace, including by failing to provide reliable electricity for light and airflow in the workplace, by failing to provide a reliable method of communication, and by maintaining an excessive amount of debris and trash in the workplace.  In other words, it is of no significance that Beckwitt claims he was not required to install a smoke detector or have an emergency exit as those are but two measures that could have been taken to establish a reasonably safe workplace, but were not, and Beckwitt's own conduct and other factors contributed to the risk of danger in the work setting.

---

[20]Beckwitt contends that he did not have a duty to utilize specific fire safety measures, such as installing a smoke detector or providing emergency egress from an accidental fire.  Beckwitt argues that there is no such duty under the common law. The State points out:

> Beckwitt was not charged with involuntary manslaughter because he failed to fulfill his legal duty to install a smoke detector.  As the jury was instructed, the State's legal duty theory of involuntary manslaughter was based upon Beckwitt's failure to fulfill his common law duty to provide Khafra, his employee, with a reasonably safe place to work.

Similarly, Beckwitt's reliance on the 19th century case of <u>Jones v. Granite Mills</u>, 126 Mass. 84 (1878) for the proposition that the duty to provide a safe workplace does not include a duty to provide emergency egress from an accidental fire is not persuasive. In <u>Jones</u>, <u>id.</u> at 88-89, the Supreme Judicial Court of Massachusetts held that the owner of a mill could not be held liable for failing to ensure that employees escaped a fire where there was no evidence that the "failure to construct proper and additional means of exit from a mill in case of fire in any way contributed to the occurrence of the fire itself" or that the owner failed to take proper precautions. In other words, there was no evidence that the mill owner had been negligent. <u>See id.</u> at 89. The Court explained: "The master is not liable to the servant unless he has been negligent in something which he has contracted or undertaken with his servants to do, and he has not undertaken to protect him from the results of casualties not caused by him or beyond his control." <u>Id.</u> at 89 (citation omitted).

What Beckwitt fails to take into account is that, although language in <u>Jones</u> may say that there is no common law duty for an owner of a building to provide a particular manner of escape from a fire, the case stands for the larger principle that an employer who acts negligently in failing to take proper precautions or who negligently contributes to the occurrence of the fire may be liable. Under the theory discussed in <u>Jones</u>, Beckwitt's conduct in maintaining an unsafe work environment that prevented Khafra's escape from the fire could fairly be determined to be negligence. <u>Jones</u> does not conflict with the principle well established in Maryland law that an employer owes a general duty to an employee to provide a reasonably safe workplace.

We are more persuaded by the State's reliance on <u>Commonwealth v. Godin</u>, 371

N.E.2d 438, 441-42, 444 (Mass. 1977), a case involving a discussion of an employer's duty of reasonable care and the circumstances sufficient to demonstrate wanton or reckless conduct. In Godin, id. at 440, the president of a fireworks manufacturing company was convicted of manslaughter for the deaths of three employees that occurred as a result of an explosion at the company's manufacturing plant. The defendant appealed and the Supreme Judicial Court of Massachusetts affirmed the convictions. See id. The defendant argued that the indictments were insufficient because, as of the time of the explosion, no court decision held that an employer owed his employees a duty of reasonable care in the operation and maintenance of the workplace. See id. at 442.

The Supreme Judicial Court of Massachusetts concluded that involuntary manslaughter, a common law crime, "is an unlawful homicide unintentionally caused by an act which constitutes such a disregard of probable harmful consequences to another as to amount to wanton or reckless conduct." Id. (cleaned up). The Court determined that the indictments were legally sufficient, holding that "[a]n employer whose acts or omissions constitute a disregard for the probable harmful consequences and loss of life as to amount to wanton or reckless conduct is properly charged with manslaughter where a foreseeable death is caused thereby." Id. at 443.

The Court explained that there was evidence presented from which the jury could conclude that, prior to the explosion, the amount of fireworks stored in one of the buildings "had reached unprecedented levels; [] the defendant had been warned of the dangers posed by such accumulations; [] nothing was done to remedy the situation; and [] increments in such storage increased the risk of explosion and resulting harm[.]" Id. at 444. The Court

- 46 -

concluded that the "evidence, if believed, would warrant the jury in concluding that the defendant should have been aware and indeed was aware of the increased risk of harm and thus his failure to remedy the situation was the kind of conduct which constitutes wanton and reckless conduct." Id. The Court explained that "[r]ecklessness involves conscious creation of a substantial and unjustifiable risk" and, so long as "the defendant's conduct was reckless as far as the risk of explosion was concerned, he must then be held accountable for the probable consequences of such conduct." Id. (citations omitted). See also State v. Far W. Water & Sewer Inc., 228 P.3d 909, 927-29 (Ariz. Ct. App. 2010) (The Court of Appeals of Arizona held that the evidence was sufficient to support a corporation's convictions for negligent homicide where a jury could reasonably conclude that management was "aware of the substantial and unjustifiable risk of death or physical injury involved in working in" the sewage treatment plant and consciously disregarded that risk, and that management's conduct "constituted a gross deviation from the standard of care or conduct under a reasonable person standard[.]").

As in Godin, the evidence in this case was sufficient for a rational juror to conclude that Beckwitt should have been aware, and was in fact aware, of the risk of harm to Khafra posed by the deplorable conditions in the workplace, *i.e.*, the basement, and that his failure to remedy the conditions was conduct that demonstrated a wanton and reckless disregard for Khafra's safety. Beckwitt hired Khafra to live and work in a basement filled with trash and debris, with spotty electricity provided by a series of extension cords and power strips, and without a reliable manner for Khafra to contact him. The conditions in the basement made it difficult to move around. Testimony at trial established that Khafra would have

- 47 -

had to crawl through and climb over debris, including buckets and bags of cement, to get out of the basement. Beckwitt created unsafe conditions in the basement that made escape from a fire, or any other emergency for that matter, difficult if not impossible and allowed those conditions to exist while Khafra worked in the basement for weeks at a time. Moreover, Beckwitt's conduct on the day of the fire demonstrated a reckless and wanton disregard for Khafra's life. Based on all of the above, the jury could have concluded that Beckwitt violated his common law duty to provide a reasonably safe workplace with reckless indifference as to whether his actions or inactions endangered Khafra and that Beckwitt's failure to fulfill his duty constituted gross negligence. Cf. DiGennaro, 415 Md. at 564-65, 3 A.3d at 1208-09.

We are not convinced by Beckwitt's attempt to differentiate his conduct from that of other defendants convicted of manslaughter where death resulted from a fire. Beckwitt's conduct was as wanton and reckless as the conduct of defendants convicted of involuntary manslaughter in other cases. In Commonwealth v. Welansky, 55 N.E.2d 902, 904, 906-07 (Mass. 1944), the defendant owned and operated a nightclub where several of the emergency exits were locked or blocked and "[s]ome employees, and a great number of patrons, died in [a] fire" and others with burns and injuries from smoke died within a few days. Notably, the Supreme Judicial Court of Massachusetts stated that, to convict the defendant of manslaughter, the prosecution did not need to prove that the defendant caused the fire through wanton or reckless conduct, but instead that "[i]t was enough to prove that death resulted from his wanton or reckless disregard of the safety of patrons in the event of fire from any cause." Id. at 912. In Commonwealth v. Zhan Tang Huang, 25 N.E.3d

315, 318-19, 325, 327 (Mass. App. Ct. 2015), after tenants (a father and his two young sons) died as a result of a fire and another tenant (the mother) was severely injured in the fire, one of the landlords of an apartment building was convicted of three counts of manslaughter and four counts of wanton or reckless violation of the State building or fire code causing serious bodily injury or death, where the landlord violated numerous code provisions related to fire safety, routinely failed to respond to requests to repair or replace missing smoke detectors, and had been warned of the safety risk posed by not installing smoke detectors.

In People v. Ogg, 182 N.W.2d 570, 571-72 (Mich. Ct. App. 1970), a mother was convicted of involuntary manslaughter where she left her two young children unattended and locked in a windowless room and the children died from inhalation of carbon monoxide fumes from a fire. The Court of Appeals of Michigan held that the defendant's actions of putting her children, or at least "allowing them with her knowledge to be locked, in a small windowless upstairs room, without proper heat, light, food, clothing or bedding, and without means of escape, and, in reckless disregard of the consequences of such action, absenting herself from the home in pursuit of her own business," rose to the level of "culpable negligence." Id. at 575. Although Beckwitt's conduct was obviously different than that of the defendants in these cases, the evidence demonstrated that his failure to provide a reasonably safe workplace was done with reckless indifference as to whether his conduct endangered Khafra and that a reasonable person would have been aware of the substantial risk of danger that Khafra faced.

Turning to causation, we conclude that there was sufficient evidence of both actual

and legal causation. As to actual, but-for causation, the evidence was sufficient for the jury to have concluded that, but for Beckwitt's conduct, *i.e.*, having subjected Khafra to the dangerous conditions that existed in Beckwitt's basement, Khafra would not have died in the fire. The jury could have reasonably inferred that Khafra would have been able to escape the relatively minor fire but for the circumstance that the basement was full of trash and debris that impeded Khafra's ability to move freely about. The jury could also have reasonably inferred that but for Beckwitt's failure to promptly respond to the two electrical failures, Khafra would not have been trapped in the fire. As the Court of Special Appeals recognized, although Beckwitt "did not intentionally set the fire, his disregard for safety, including his refusal to recognize the implications of two electrical failures on the day of the fire, satisfy actual causation." Beckwitt, 249 Md. App. at 372, 245 A.3d at 224.

As to legal causation, we are persuaded that the State produced sufficient evidence demonstrating that Khafra's death was a reasonably foreseeable consequence of Beckwitt's conduct. A reasonable person would have been able to discern the risk of danger or harm to Khafra from the working conditions in the basement. Although the evidence demonstrated that the fire likely started as the result of a latent defect in an electrical outlet and that Beckwitt would not have been aware of the defect, it was entirely foreseeable that in a fire, or any other emergency that might occur in the basement, due to the numerous unsafe conditions that Beckwitt allowed to exist, Khafra's ability to escape would have been seriously impeded.

In sum, we hold that the evidence was sufficient to support Beckwitt's conviction for involuntary manslaughter under both a gross negligence theory and a legal duty theory.

- 50 -

As such, we, like the Court of Special Appeals, affirm the conviction. See id. at 373, 245 A.3d at 224.

## III. Lesser-Included Offense

### The Parties' Contentions

Beckwitt contends that legal duty involuntary manslaughter is a type of gross negligence involuntary manslaughter and a lesser-included offense of depraved heart murder. Beckwitt argues that although there was not a particularized verdict sheet, the substance of the State's closing argument leaves little doubt that the jury convicted him of "failure to perform a legal duty gross negligence manslaughter" (not "affirmative act gross negligence manslaughter") and depraved heart murder based on the allegation that he showed "extreme disregard" in breaching a legal duty in the workplace. Beckwitt also asserts that the jury was not properly instructed as to the elements of the legal duty theory of involuntary manslaughter, which led to his conviction of the offense. Although Beckwitt's contention contains different subparts, at bottom, it appears that he argues that legal duty involuntary manslaughter is a lesser-included offense of depraved heart murder, the jury instruction concerning the legal duty theory was flawed, and his conviction for involuntary manslaughter must be reversed.

The State responds that the jury instructions given by the circuit court and the State's closing argument conveyed to the jury that the gross negligence and legal duty theories are distinct theories of involuntary manslaughter, and only gross negligence involuntary manslaughter is a lesser-included offense of depraved heart murder. The State contends that Beckwitt's conviction for depraved heart murder was necessarily based on his

- 51 -

conviction for gross negligence involuntary manslaughter.

## Analysis

As an initial matter, for two reasons, it is not necessary that we reach this issue. First, we have concluded that the evidence was sufficient to support Beckwitt's involuntary manslaughter conviction under both a gross negligence and a legal duty theory and next, as discussed below, we affirm the Court of Special Appeals's conclusion that the evidence was insufficient to sustain a conviction for depraved heart murder. Given these determinations, we need not address Beckwitt's contention that legal duty involuntary manslaughter is a type of gross negligence involuntary manslaughter and a lesser-included offense of depraved heart murder, or, for that matter, review the circuit court's instruction as to legal duty involuntary manslaughter.

In evaluating the sufficiency of the evidence, we have done just as Beckwitt urged and reviewed his challenge to the legal duty involuntary manslaughter conviction, set forth the elements of both the legal duty and gross negligence manslaughter theories (which are not the same), and determined that the evidence was sufficient to support a conviction under either theory. As discussed below, we affirm the Court of Special Appeals's reversal of Beckwitt's conviction for second-degree depraved heart murder, so it no longer matters whether or not legal duty involuntary manslaughter is a lesser-included offense of depraved heart murder. Nonetheless, to put to rest any lingering question about the integrity of Beckwitt's conviction for involuntary manslaughter, we will briefly address the issues of whether legal duty manslaughter is a lesser-included offense of depraved heart murder and whether the jury was led to believe that was the case, and review the challenge to the circuit

court's jury instruction on legal duty involuntary manslaughter.

Legal duty involuntary manslaughter is not a lesser-included offense of depraved heart murder. A key element of legal duty involuntary manslaughter is that the defendant had a legal duty to perform and failed to do so. The offense of depraved heart murder contains no such element. The pattern jury instruction for depraved heart murder sets forth the elements of the offense as follows:

> Second degree murder is the killing of another person while acting with an extreme disregard for human life. In order to convict the defendant of second degree murder, the State must prove:
>
> > (1) that the defendant caused the death of (name);
>
> > (2) that the defendant's conduct created a very high degree of risk to the life of (name); and
>
> > (3) that the defendant, conscious of such risk, acted with extreme disregard of the life endangering consequences.

MPJI-Cr 4:17.8A. In short, legal duty involuntary manslaughter has an extra element— the existence of a legal duty imposed upon the defendant—that depraved heart murder does not and as such under the required elements test is not a lesser-included offense. See State v. Wilson, 471 Md. 136, 178-79, 240 A.3d 1140, 1164 (2020).[21]

---

[21]In Wilson, 471 Md. at 178-79, 240 A.3d at 1164, we explained the required evidence test, stating:

> Under the required evidence test—also known as the same evidence test, Blockburger test, or elements test—Crime A is a lesser-included offense of Crime B where all of the elements of Crime A are included in Crime B, so that only Crime B contains a distinct element. In other words, neither Crime A nor Crime B is a lesser-included offense of the other where each crime contains an element that the other does not.

Gross negligence involuntary manslaughter is, however, a lesser-included offense of depraved heart murder. It is well-established that gross negligence involuntary manslaughter is a less culpable form of depraved heart murder. See Thomas, 464 Md. at 173 n.20, 211 A.3d at 298 n.20 ("[G]ross negligence involuntary manslaughter is a less culpable form of depraved-heart murder." (Citation omitted)); Dishman v. State, 352 Md. 279, 299, 721 A.2d 699, 708 (1998) ("While our cases have not drawn a precise line between depraved heart murder and involuntary manslaughter and we are not called upon to do so in this case, we observe that the difference is one of the degree of culpability.").[22]

In this case, the circuit court's jury instructions made clear that the gross negligence and legal duty theories of involuntary manslaughter are separate and distinct and that only gross negligence involuntary manslaughter is a lesser-included offense of depraved heart murder. The circuit court gave the Maryland Criminal Pattern Jury Instruction for second-

---

(Citation omitted).

[22]We are aware that the Court of Special Appeals stated:

Although depraved heart murder is often described in terms of being a more culpable manifestation of gross negligence involuntary manslaughter, we are aware of no authority that depraved heart murder may only arise from the grossly negligent modality of involuntary manslaughter. In other words, it seems possible that the negligent omission of a lawful duty variety of manslaughter could, in a proper case, be elevated to the more culpable crime of depraved heart murder.

Beckwitt, 249 Md. App. at 352 n.10, 245 A.3d at 212 n.10. The remarks by the Court of Special Appeals do not serve to convert the legal duty theory of involuntary manslaughter into a lesser-included offense of depraved heart murder. They are merely an acknowledgement *in dicta* that in some instances the same conduct may satisfy the elements of both offenses. While the offenses may have different elements, they are not mutually exclusive with respect to conviction.

degree depraved heart murder,[23] stating:

> The defendant is charged with a crime of depraved heart murder, this charge includes second degree depraved heart murder and involuntary manslaughter. Second degree depraved heart murder is the killing of another person while acting with an extreme disregard for human life.
>
> In order to convict the defendant of second degree depraved heart murder[,] the State must prove that the defendant cause[d] the death of Askia Khafra, that defendant's conduct created a very high degree of risk to the life of Askia Khafra and that the defendant conscious of such risk acted with extreme disregard of the life endangering consequences.

Immediately after that, the circuit court instructed the jury on the two theories of

involuntary manslaughter at issue, stating:

> Involuntary manslaughter, there are two theories. The [d]efendant is charged with the crime of involuntary manslaughter.
>
> In order to convict the defendant of involuntary manslaughter[,] the State must prove that the defendant acted in a grossly negligent manner and that this grossly negligent conduct caused the death of Askia Khafra. Grossly negligent means that defendant, while aware of the risk, acted in a manner that created a high risk to and showed a reckless disregard for human life.[24] Or alternative theory, either B or C, if you find that Askia Khafra and the defendant had an employer/employee relationship the defendant has a legal duty to provide his employee with a reasonably safe place in which to work.
>
> In order to convict the defendant of involuntary manslaughter[,] the

---

[23]See MPJI-Cr 4:17.8A.

[24]The pattern jury instruction on gross negligence involuntary manslaughter, MPJI-Cr 4:17.8B, provides:

> The defendant is charged with the crime of involuntary manslaughter. In order to convict the defendant of involuntary manslaughter, the State must prove:
>
> (1) that the defendant acted in a grossly negligent manner; and
>
> (2) that this grossly negligent conduct caused the death of (name).
>
> "Grossly negligent" means that the defendant, while aware of the risk, acted in a manner that created a high risk to, and showed a reckless disregard for, human life.

- 55 -

State must prove that the victim, Askia Khafra, was employed by the defendant, that defendant failed to perform his legal duty, that the defendant's failure to perform the legal duty caused the death of the victim and that by failing to perform this legal duty defendant acted in a grossly negligent manner. Grossly negligent means that defendant, while aware of the risk, acted in a manner that created a high risk to and showed a reckless disregard for human life.

The depraved heart murder jury instruction given by the circuit court was the pattern jury instruction on the offense and as such contained language advising that in order to convict Beckwitt of second-degree depraved heart murder, among other things, the jury must find that the "defendant's conduct created a very high degree of risk to the life of Askia Khafra and that the defendant conscious of such risk acted with extreme disregard of the life endangering consequences." This language mirrored the jury instruction that the circuit court gave pertaining to the gross negligence theory of involuntary manslaughter, which referred to the defendant, while aware of the risk, acting in a manner that created a high risk to and showing a reckless disregard for human life. In contrast, the depraved heart murder jury instruction given by the circuit court included no mention of the legal duty theory of manslaughter. In other words, the circuit court did not instruct the jury that in order to convict Beckwitt of depraved heart murder, the jury must find that Beckwitt was Khafra's employer or that Beckwitt failed to fulfill a legal duty to provide Khafra with a reasonably safe workplace.

During closing argument, the prosecutor told the jury that depraved heart murder was a greater offense of gross negligence involuntary manslaughter. At the outset of the State's closing argument, the prosecutor stated:

So, there are two crimes that you're going to be considering, depraved

heart murder and involuntary manslaughter and there's two ways to get to involuntary manslaughter and either one of them is up to you. Depraved heart murder, as you heard, it involves and I'm not going to restate it out but the main difference is that it involves what's called a very high degree of risk to human life and extreme disregard for the risk taking behavior or for the life of others and the risk taking behavior.

The main difference between that and one of the forms of involuntary manslaughter is the word very, very high degree of risk and involuntary manslaughter is high degree of risk, and the word extreme. Extreme disregard and involuntary manslaughter reckless disregard. So it's a matter of degrees between the depraved heart murder and one of those ways you can get to involuntary manslaughter.

The other way to get to involuntary manslaughter is by finding that there was an employer/employee relationship between the defendant and the victim and that therefore he owed him a duty to keep the workplace safe and he acted with a high degree of risk and reckless disregard in breaching that duty.

The prosecutor's explanation of the offenses during closing argument was consistent with what the circuit court had essentially instructed—that gross negligence involuntary manslaughter is a lesser-included offense of a depraved heart murder.[25]

### IV. Legal Duty Involuntary Manslaughter Jury Instruction

### The Parties' Contentions

Beckwitt contends that a jury instruction on legal duty involuntary manslaughter

---

[25]Beckwitt draws our attention to jury notes in the case, in which the jury asked for an example of second-degree depraved heart murder and the definition of "extreme disregard" and posits that, based on the jury notes, "the jury considered the lesser-included offenses first" meaning that the jury moved upward, first finding him guilty of legal duty involuntary manslaughter and then finding him guilty of depraved heart murder. The State points out that even if Beckwitt is correct that the jury considered the involuntary manslaughter first, he fails to explain why the jury would have considered the legal duty theory only and not both that and the gross negligence theory, especially where the circuit court instructed the jury on both theories. We agree with the State. Beckwitt's contention concerning the jury notes does not support a conclusion that the jury convicted him only of legal duty involuntary manslaughter and not gross negligence involuntary manslaughter.

must include that the State is required to prove that: (1) the defendant was aware of his obligation to perform a legal duty; (2) the defendant was aware that his failure to perform his legal duty would create a high degree of risk to human life; (3) the defendant consciously disregarded his legal duty; and (4) a reasonable employer in the defendant's position would not have disregarded his legal duty; and that the circuit court's failure to instruct the jury on these points constituted reversible error.

The State points out that Beckwitt did not request that the circuit court give the instruction on legal duty involuntary manslaughter that he now claims was reversible error for the court not to have given and argues that the issue is not preserved for appellate review. The State contends that, if this Court considers the merits of the issue, the Court should conclude that the circuit court's instruction on legal duty involuntary manslaughter was a correct statement of law.

### Standard of Review

Generally, where a party fails to object to a trial court's refusal to give a requested instruction, the issue is not preserved for appellate review. See, e.g., Yates v. State, 429 Md. 112, 130, 55 A.3d 25, 36 (2012) ("In general, a party must object to the failure to give a particular instruction promptly after the instructions are delivered, stating the grounds for the objection." (Citation omitted)); Watts v. State, 457 Md. 419, 426, 179 A.3d 929, 933 (2018) ("This Court has consistently repeated that the failure to object to an instructional error prevents a party on appeal from raising the issue under Rule 4-325([f])." (Citations omitted)).

"We review a trial court's decision to propound or not propound a proposed jury instruction under an abuse of discretion standard." Lawrence v. State, 475 Md. 384, 397, 257 A.3d 588, 596 (2021) (citation omitted). "We review *de novo* whether a jury instruction was a correct statement of the law." State v. Elzey, 472 Md. 84, 107, 244 A.3d 1068, 1082 (2021) (citation omitted). This is so "because even in areas where a trial court has discretion, no discretion is afforded to trial courts to act upon an erroneous conclusion of law." Id. at 107, 244 A.3d at 1082 (cleaned up). Generally, jury instructions are reviewed as a whole to determine whether they fairly or accurately cover the issues and are generated by the evidence. See Derr v. State, 434 Md. 88, 133, 73 A.3d 254, 281 (2013) ("On review, jury instructions must be read together, and if, taken as a whole, they correctly state the law, are not misleading, and cover adequately the issues raised by the evidence, the defendant has not been prejudiced and reversal is inappropriate. Reversal is not required where the jury instructions, taken as a whole, sufficiently protected the defendant's rights and adequately covered the theory of the defense." (Citation omitted)).

**Analysis**

The contention that Beckwitt raises in this Court concerning the four points of law that he claims a jury must be instructed on with respect to legal duty involuntary manslaughter is not preserved for appellate review as he never asked the circuit court to instruct the jury on any of the four points. See Md. R. 4-325(f) ("No party may assign as error the giving or the failure to give an instruction unless the party objects on the record promptly after the court instructs the jury, stating distinctly the matter to which the party

objects and the grounds of the objection.").[26]  Even if the issue were preserved, we would

conclude that the circuit court did not abuse its discretion in instructing the jury as to legal

duty involuntary manslaughter because the instruction was a correct statement of law and

covered the essential elements of the offense.

The record reflects that prior to trial Beckwitt filed written objections to the court's

proposed jury instructions.  Beckwitt argued that an instruction on legal duty involuntary

manslaughter should not be given at all because he alleged that he was not charged with

that theory of involuntary manslaughter.  Beckwitt requested that, if the circuit court were

to instruct the jury as to legal duty involuntary manslaughter, the circuit court instruct the

jury on eleven points that he maintained were related to legal duty.  In particular, Beckwitt

requested the following instructions:

1.  The mere happening of an injury does not impute a failure to comply with a legal duty.
2.  One cannot be said to have failed to meet one's legal duty merely because he failed to provision against a happening that he could not reasonably be expected to foresee.
3.  An employer is not an insurer of the employee's safety nor does he warrant the safety of the employee.
4.  Where there is no evidence that an alleged defect could have been discovery [sic] by proper inspection, a sudden and unexpected event affords no inference of a breach of a legal duty on the part of the employer[.]
5.  You may consider whether the employee was familiar with working conditions prior to the date of the event.
6.  There is no breach of a legal duty where the alleged perilous working conditions were known both to the employer and the employee.
7.  The legal duty of an employer arises from the employer's superior

---

[26]Effective July 1, 2021, Maryland Rule 4-325(e) was relettered as Maryland Rule 4-325(f) without change.  See Court of Appeals of Maryland, Rules Order at 33 (Mar. 30, 2021),  available  at  https://www.mdcourts.gov/sites/default/files/rules/order/ro206.pdf [https://perma.cc/7LUV-3ZVV].

knowledge of the working conditions from that of the employee.

8.   An employer's duty exi[s]ts only when the dangerous circumstance is known to the employer and not known [to] the person injured.

9.   An employer does not breach [a] legal duty for failure to warn of a defect not known to the employer.

10.  An employer [] does not breach a legal duty when injury occurs that is entirely collater[]al to and not a probable consequence of the work for which the employee was hired.

11.  There must be a causal connection between the alleged breach of a legal duty and the resulting injury.

None of the eleven points concern the matters that Beckwitt now claims the circuit court was required to instruct the jury on.

In addition, in his written objections, Beckwitt alleged that the circuit court's proposed jury instruction on legal duty involuntary manslaughter was "not a complete and fair statement of the law" and was misleading in that it advised the jury that "the State must prove that 'by failing to perform a legal obligation, the defendant acted in a grossly negligent manner.'" On brief, Beckwitt contends that, by making these allegations, he preserved for appellate review the issue that he raises. Regardless of Beckwitt's contention, the record reflects that he did not request, either before or during trial, that the circuit court instruct the jury on the points that he now claims were necessary.

Beckwitt argues nonetheless that his contention is preserved because he advised the circuit court that the proposed involuntary manslaughter instruction "omitted essential elements" and, as such, permitted the jury to convict him based solely on finding that he failed to perform a legal duty and the death of the victim. The problem with Beckwitt's contention, however, is that the purpose of the language in Maryland Rule 4-325(f)— prohibiting a party from raising on appeal an error on the trial court's part in giving or

failing to give an instruction "unless the party objects on the record promptly after the court instructs the jury, stating distinctly the matter to which the party objects and the grounds of the objection"—"is to give the trial court an opportunity to correct its charge if it deems correction necessary." Sequeira v. State, 250 Md. App. 161, 196-97, 248 A.3d 1151, 1172 (2021) (cleaned up). Because Beckwitt's written objections to the legal duty involuntary manslaughter jury instruction did not include any of the four points he urges as error before us, the circuit court was deprived of the opportunity to consider the request and to correct the proposed instruction if required.

Beckwitt himself apparently recognizes that the issue is not preserved, requesting that, "[a]ssuming, *arguendo*, the issue was not preserved," we exercise our discretion to consider the matter by engaging in plain error review. As we stated in Newton v. State, 455 Md. 341, 364, 168 A.3d 1, 14 (2017), "[p]lain error review is reserved for those errors that are compelling, extraordinary, exceptional or fundamental to assure the defendant of a fair trial." (Cleaned up). Before an appellate court can exercise its discretion to find plain error, the following four conditions must be satisfied:

> (1) there must be an error or defect—some sort of deviation from a legal rule—that has not been intentionally relinquished or abandoned, *i.e.*, affirmatively waived, by the appellant; (2) the legal error must be clear or obvious, rather than subject to reasonable dispute; (3) the error must have affected the appellant's substantial rights, which in the ordinary case means he must demonstrate that it affected the outcome of the [] proceedings; and (4) the error must seriously affect the fairness, integrity or public reputation of judicial proceedings.

Id. at 364, 168 A.3d at 14 (cleaned up). The circumstances of this case do not satisfy the conditions for plain error review, as for instance, any error regarding the instruction was

not clear and obvious but rather is subject to reasonable disagreement as can be seen from the arguments raised by the State on brief in this Court, urging that the legal duty involuntary manslaughter instruction was a correct statement of law.

Even though the issue is not preserved for appellate review nor a matter that qualifies for plain error review, we nonetheless address the matter and determine that the legal duty involuntary manslaughter jury instruction given by the circuit court was a correct statement of law. The circuit court instructed the jury that, to convict Beckwitt of legal duty involuntary manslaughter, the State was required to prove that Khafra was employed by Beckwitt, that Beckwitt failed to perform his legal duty to provide Khafra with a reasonably safe workplace, that Beckwitt's failure to perform the legal duty caused Khafra's death, and that Beckwitt acted in a grossly negligent manner by failing to perform his legal duty, meaning that Beckwitt, while aware of the risk, acted in a manner that created a high risk to and showed a reckless disregard for human life.

Beckwitt contends that the circuit court erred in not instructing the jury that the State was required to prove that he had knowledge of the duty owed to Khafra. However, our case law demonstrates that the State was required to prove that Beckwitt had knowledge of the facts that gave rise to the obligation to perform the duty, not that the State was required to prove that Beckwitt had knowledge of the statutory, common law, or constitutional basis for the creation of the duty. Cf. DiGennaro, 415 Md. at 564, 3 A.3d at 1208 (In stating that the defendant could have been convicted of legal duty involuntary manslaughter, we stated that a statute imposed on the defendant a duty to take appropriate remedial measures, not that the defendant had to be aware of the statute.).

In <u>State v. Kanavy</u>, 416 Md. 1, 4-5, 4 A.3d 991, 992-93 (2010), five defendants, who were employees of a juvenile detention facility, were each charged with reckless endangerment after a juvenile died at the facility while they were on duty and they failed to contact emergency services in a timely manner. The defendants filed motions to dismiss the indictments, arguing that the reckless endangerment statute does not proscribe the failure to act. See <u>id.</u> at 4, 4 A.3d at 993. The circuit court granted the motions and the Court of Special Appeals affirmed. See <u>id.</u> at 4, 4 A.3d at 993. We reversed and remanded the case for trial, concluding "that the conduct proscribed by the reckless endangerment statute includes the wilful failure to perform a legal duty." <u>Id.</u> at 5, 10-11, 4 A.3d at 993, 996. We explained that, to convict a defendant of reckless endangerment as charged in the indictment, the State would be required to prove beyond a reasonable doubt, among other things, that the defendant owed a duty to obtain emergency medical care for the juvenile and that the defendant "was aware of his obligation to perform that duty[.]" <u>Id.</u> at 12-13, 4 A.3d at 997. We stated that none of the defendants could be convicted of reckless endangerment based on force used against the juvenile, but evidence of injuries sustained by the juvenile would be admissible "for the limited purpose of establishing the [defendant]s' awareness of the duty to obtain emergency services for the deceased." <u>Id.</u> at 12 n.2, 4 A.3d at 997 n.2.

Applying the same analysis to this case, it is clear that the State was not required to prove that Beckwitt knew that as an employer he had a legal duty to provide an employee with a reasonably safe working environment. Rather, the State needed to prove that Beckwitt had knowledge of the employer-employee relationship and knowledge of the

- 64 -

dangerous conditions of Khafra's work environment that gave rise to the duty to correct or eliminate the unsafe conditions. If we were to conclude otherwise and require that a defendant have actual knowledge of the existence of a statutory or common law duty, we would, as the State points out, in essence hold that ignorance of the law is a defense.

Two of the other points raised by Beckwitt—that the circuit court needed to instruct the jury that the State was required to prove that he was aware that his failure to perform his legal duty would create a high degree of risk to human life, and that he consciously disregarded his legal duty—were covered by the circuit court's instruction. The circuit court instructed the jury that the State was required to prove that, in failing to perform his legal duty, the defendant acted in a grossly negligent manner, which the circuit court described as meaning that the "defendant, while aware of the risk, acted in a manner that created a high risk to and showed a reckless disregard for human life." The jury instruction given by the circuit court covered all of the essential elements of legal duty involuntary manslaughter and was a correct statement of the law.[27] In sum, the circuit court did not err in giving the legal duty involuntary manslaughter jury instruction.

## V. Depraved Heart Murder

### The Parties' Contentions

The State contends that the evidence was sufficient to support the conviction for second-degree depraved heart murder because the evidence established that Beckwitt's

---

[27]As to the fourth point, although Beckwitt contends that the circuit court was required to instruct that a reasonable employer in his position would not have disregarded his legal duty, this is not one of the elements of legal duty involuntary manslaughter. See DiGennaro, 415 Md. at 566, 3 A.3d at 1210.

conduct was reasonably likely or certain to result in death. The State asserts that in reviewing the sufficiency of the evidence, "the Court of Special Appeals overlooked or devalued a number of salient facts and failed to consider all of the facts cumulatively[,]" including the danger of the tunnels, and the conditions in the basement, which, according to the State, were inherently dangerous.

For his part, Beckwitt responds that the Court of Special Appeals was correct in concluding that depraved heart murder requires conduct that must be reasonably likely, if not certain, to cause death, and in determining that the evidence in this case was insufficient to satisfy that element of the offense. Beckwitt argues that none of his "conduct was inherently dangerous, let alone likely fatal, even in the totality." Beckwitt asserts that neither the tunnels, the hoarding conditions in the basement, nor the use of multiple extension cords, whether considered individually or cumulatively, were likely, or certain, at any moment to cause death.

## Law

We have described depraved heart murder as "one of the unintentional murders that is punishable as murder because another element of blameworthiness fills the place of intent to kill." Robinson v. State, 307 Md. 738, 744, 517 A.2d 94, 97 (1986) (cleaned up). Depraved heart murder constitutes "the form of murder that establishes that the willful doing of a dangerous and reckless act with wanton indifference to the consequences and perils involved, is just as blameworthy, and just as worthy of punishment, when the harmful result ensues, as is the express intent to kill itself." Id. at 744, 517 A.2d at 97 (cleaned up). "The critical feature of depraved heart murder is that the act in question be committed

under circumstances manifesting extreme indifference to the value of human life." Id. at

745, 517 A.2d at 98 (cleaned up). We elaborated:

> A depraved heart murder is often described as a wanton and wilful killing. The term 'depraved heart' means something more than conduct amounting to a high or unreasonable risk to human life. The perpetrator must or reasonably should realize the risk his behavior has created to the extent that his conduct may be termed wilful. Moreover, the conduct must contain an element of viciousness or contemptuous disregard for the value of human life which conduct characterizes that behavior as wanton.

Id. at 745, 517 A.2d at 98 (cleaned up). Similarly, in DeBettencourt v. State, 48 Md. App.

522, 530, 428 A.2d 479, 484, cert. denied, 290 Md. 713 (1981), the Court of Special

Appeals explained that depraved heart murder involves "the deliberate perpetration of a

knowingly dangerous act with reckless and wanton unconcern and indifference as to

whether anyone is harmed or not."

In In re Eric F., 116 Md. App. 509, 519, 698 A.2d 1121, 1126 (1997), the Court of

Special Appeals reiterated that "[t]he essential element of depraved heart murder is that the

act in question be committed under circumstances manifesting extreme indifference to the

value of human life." (Cleaned up). Thus, the key question to consider "is whether the

defendant engaged in conduct that created a very high risk of death or serious bodily injury

to others." Id. at 519, 698 A.2d at 1126 (cleaned up). Depraved heart "murder may be

perpetrated without the slightest trace of personal ill-will" and, instead, "the willful doing

of a dangerous and reckless act with wanton indifference to the consequences and perils

involved, is just as blameworthy, and just as worthy of punishment, when the harmful result

ensues, as is the express intent to kill itself." Id. at 520, 698 A.2d at 1126 (cleaned up).

In Pagotto v. State, 127 Md. App. 271, 276, 732 A.2d 920, 923 (1999), aff'd, 361

Md. 528, 762 A.2d 97 (2000), the Honorable Charles E. Moylan Jr. stated that "[o]n the matrix of blameworthy states of mind that will support a verdict of either civil liability or criminal guilt on the part of an unquestioned homicidal agent, one of those mental states is" where the "agent causes an unintended death by carelessly or negligently doing some act lawful in itself." (Cleaned up). "At the bottom end of the culpability scale is mere civil liability for a wrongful death," *i.e.*, civil negligence, "where there may be uncontestable fault and perhaps heavy civil liability but still something less than criminality." Id. at 276, 732 A.2d at 923. Higher up on the "scale of blameworthy negligence are those more gross deviations from the standard of care used by an ordinary person where the negligent conduct can reasonably be said to manifest a wanton or reckless disregard of human life." Id. at 277, 732 A.2d at 923 (cleaned up). Such conduct constitutes gross negligence involuntary manslaughter. See id. at 277, 732 A.2d at 923. Finally, highest up on the scale of blameworthy negligence "are those acts of a life-endangering nature so reckless that they manifest a wanton indifference to human life. That level of blameworthiness constitutes second-degree murder of the depraved-heart variety." Id. at 277, 732 A.2d at 923.

As to the line distinguishing gross negligence involuntary manslaughter from second-degree depraved heart murder, Judge Moylan stated that "Maryland case law has yet provided no meaningful distinction. . . . As an abstract matter, however, we know that there is—somewhere—such a line. There must be or else there is no legally cognizable distinction between murder and manslaughter." Id. at 277, 732 A.2d at 923-24. Although the line between depraved heart murder and gross negligence involuntary manslaughter

may not be well defined, as the Court of Special Appeals in this case recognized, Maryland case law demonstrates that the line between the two offenses "appears to be as follows: depraved heart murder requires an extreme indifference to the value of human life, whereas gross negligence involuntary manslaughter requires only a wanton and reckless disregard for human life[.]" Beckwitt, 249 Md. App. at 355, 245 A.3d at 214 (cleaned up).

In Simpkins v. State, 88 Md. App. 607, 608-09, 619, 596 A.2d 655, 655-56, 661 (1991), cert. denied, 328 Md. 94, 612 A.2d 1316 (1992), the Court of Special Appeals affirmed the second-degree depraved heart murder convictions of a mother and father whose two-year-old child died of malnutrition and dehydration. The evidence showed that the child lived with her parents and her four-year-old sister, and that a houseguest who had been living with the family realized that he had not seen the child in more than a day, went into her bedroom, and discovered that she was not moving. See id. at 609, 596 A.2d at 656. According to the medical examiner, the child died of malnutrition and dehydration as she "had not been given food or drink for three to five days." Id. at 609, 596 A.2d at 656. Moreover, the child was discovered in a dirty diaper containing about three-quarters of a pound "of layered fecal material[,]" and the medical examiner believed that the diaper had not been changed in four to six days. Id. at 609, 596 A.2d at 656. Although the child was permitted to starve to death, the evidence demonstrated it was not due to the parents' inability to provide food, as the "refrigerator was crammed full of food, and they and [the older child] apparently ate quite well." Id. at 610, 596 A.2d at 656.

On appeal, the parents contended that the State had failed to prove that they acted, or failed to act, with malice. See id. at 611, 596 A.2d at 657. The Court of Special Appeals

recognized that "malice is the indispensable ingredient of murder; by its presence, homicide is murder; in its absence, homicide is manslaughter." Id. at 611, 596 A.2d at 657 (cleaned up). The Court of Special Appeals observed, though, that malice for depraved heart murder may be inferred from "the intent to do an act under circumstances manifesting extreme indifference to the value of human life[.]" Id. at 611, 596 A.2d at 657. The Court of Special Appeals noted that "[m]ost cases prosecuted under a 'depraved heart' theory involve affirmative conduct—firing a gun or driving a car or boat into a crowd, for example." Id. at 612, 596 A.2d at 657 (citations omitted). Nevertheless, "'depraved heart' murder has also been found in cases of malicious omission, including situations where a parent has maliciously allowed a small child to die of exposure or of malnutrition and dehydration." Id. at 612, 596 A.2d at 657. The Court of Special Appeals traced the history of depraved heart murder cases involving child exposure or starvation from the English common law to the present, including cases from courts in other jurisdictions. See id. at 612-19, 596 A.2d at 657-61. Applying the principles distilled from its historical review, the Court of Special Appeals concluded that the evidence in the case supported the finding of malice:

> Most of these cases—English and American—tend to be fact-specific. It is evident from all of them that mere neglect, despite its awful consequence, is not enough to establish malice and thus to support a conviction of murder. We believe, however, that . . . the court's finding of malice in this case is supported by the evidence. Where a young child, incapable of self-help, is knowingly, deliberately, and unnecessarily placed in confinement and left alone for up to five days without food, drink, or attention and death ensues from that lack, malice may be inferred. A rational trier of fact could reasonably find that death is at least a likely, if not a certain, consequence of such conduct, that any normal adult would understand and appreciate the likelihood of that consequence, and that the conduct is

- 70 -

therefore willful and wanton, manifesting viciousness or contemptuous disregard for the value of human life[.]

Id. at 619-20, 596 A.2d at 661-62 (cleaned up).

In Maryland, convictions for depraved heart murder also have been affirmed in cases involving the use of weapons, intentional infliction of physical injury resulting in death, and leaving an incapacitated person unattended knowing that death would result. In Alston v. State, 101 Md. App. 47, 58-59, 643 A.2d 468, 473-74 (1994), aff'd, 339 Md. 306, 662 A.2d 247 (1995), the Court of Special Appeals held that the evidence was sufficient to support the defendant's conviction for second-degree depraved heart murder where a fifteen-year-old was fatally shot on a street during a gunfight. The Court of Special Appeals concluded "that for approximately ten men to engage in an extended firefight on an urban street in a residential neighborhood was conduct that created a very high degree of risk of death or serious bodily injury to others." Alston, 101 Md. App. at 58, 643 A.2d at 473. In Owens v. State, 170 Md. App. 35, 43, 103, 906 A.2d 989, 993, 1027 (2006), aff'd, 399 Md. 388, 924 A.2d 1072 (2007), the Court of Special Appeals held that the evidence was sufficient to support the defendant's conviction for second-degree depraved heart murder where the evidence established that the two-year-old victim, who was the defendant's stepson, had sustained "a tremendous amount of blunt force[,]" "causing rib fractures, bruising of both the lungs and thymus, and tearing of the liver[,]" that the "injuries could not have been inflicted by the victim's four-year-old brother[,]" and that the defendant "had sole custody of the victim during the time that the injuries were sustained."

In Eric F., 116 Md. App. at 511, 522, 698 A.2d at 1122, 1127, the Court of Special Appeals held that the evidence was sufficient to support a finding of a juvenile's involvement in a delinquent act which would have constituted second-degree depraved heart murder had the juvenile been an adult. In Eric F., id. at 511, 522, 698 A.2d at 1122, 1127, the juvenile, a teenager who had been drinking with a fifteen-year-old victim, dragged the victim, who was unconscious and only partially clothed, to the woods behind his house on a cold and rainy night, and left the victim to die of hypothermia. The Court of Special Appeals determined that the juvenile's indifference toward the victim was demonstrated by his placing the victim "outside in the cold, dragging her to the woods, and leaving her there in an unconscious state[,]" placing "her in a dangerous situation and, therefore, clearly indicat[ing] his total lack of regard for her well being, considering the dangerous state in which she was placed in the sub-freezing cold." Id. at 521, 698 A.2d at 1127. The Court of Special Appeals concluded that the evidence was sufficient to support a finding that the juvenile knew that his actions would lead to the victim's death, "and that he manifested an extreme indifference to the value of her life by leaving her in the cold, and failing to seek appropriate help." Id. at 522, 698 A.2d at 1127.

**Analysis**

We hold that the evidence was not sufficient to support Beckwitt's conviction for second-degree depraved heart murder because, as the Court of Special Appeals determined, Beckwitt's conduct, although demonstrating a reckless disregard for human life, was "not the type of conduct that [was] likely, if not certain, to cause death, and thus does not rise to the level of opprobrious conduct that depraved heart murder proscribes—conduct that is

- 72 -

so extreme in its disregard to human life that it may be deemed willful." Beckwitt, 249 Md. App. at 378, 245 A.3d at 227. Beckwitt's conduct—having Khafra dig tunnels underneath his home, in a basement with electrical power supplied by multiple extension cords and power strips and filled with trash and debris that would have severely impeded Khafra's escape in the event of any emergency—whether considered individually or cumulatively, did not constitute conduct that could be said to be reasonably likely, if not certain, to cause death and thus did not satisfy the malice element necessary for depraved heart murder.

As the Court of Special Appeals observed, the State conceded that, at trial, it did not present evidence that the tunnels were structurally unsafe. Id. at 377, 245 A.3d at 227. In other words, the tunnels were not structurally unsound, ready to collapse or cave in at a moment's notice. To be sure, the evidence demonstrated that during a power outage, it was dark, and the airflow was restricted. But, that circumstance by itself was not reasonably likely, if not certain, to cause death.

In addition, it is readily apparent that, although Beckwitt's basement was full of trash and debris, to the point that the hoarding conditions hampered escape from the basement in the event of an emergency, the conditions in the basement in and of themselves did not pose an imminent risk of death to Khafra. Similarly, that Beckwitt used multiple extension cords and power strips to provide electricity, and that he was aware of two power failures in the hours before the fire, does not constitute conduct reasonably likely, if not certain, to cause death. Even when all of the environmental factors and Beckwitt's actions are considered in the aggregate, we are not able to conclude that a rational trier of fact

- 73 -

could have found that Beckwitt's conduct demonstrated an extreme indifference to the value of human life or rose to the level such that it was reasonably likely, if not certain, to cause death.

The State takes issue with the Court of Special Appeals having pointed out that "other individuals, including Khafra, worked in the tunnels without incident[,]" Beckwitt, 249 Md. App. at 377, 245 A.3d at 227, and contends that the circumstance that others worked in the tunnels and did not die is irrelevant and does not mean that Beckwitt's conduct was not reasonably likely to cause death. The State relies on two out-of-state cases involving fatal traffic accidents in which depraved heart murder convictions were affirmed—State v. Fuller, 531 S.E.2d 861 (N.C. Ct. App. 2000) and State v. Doub, 95 P.3d 116 (Kan. Ct. App. 2004)—for the argument that, "[i]n both of those cases, the defendant could have managed to make it home without killing anyone[,]" but "[t]hat does not mean that their conduct was not reasonably likely to result in death[,]" especially "where the same high-risk behavior is repeated day after day[.]" We are unpersuaded by the State's reliance on those cases, as, unlike in this case, the defendants in Fuller and Doub engaged in numerous actions that, either individually, or cumulatively, were indeed likely to cause death.

In Fuller, 531 S.E.2d at 864, the Court of Appeals of North Carolina concluded that a charge of second-degree murder was properly submitted to the jury and that the defendant's conduct "manifest[ed] a mind utterly without regard for human life and social duty, supporting a finding of malice sufficient for a conviction of second-degree murder." (Citations omitted). The defendant, while driving drunk, led police on a 16.7-mile high-

- 74 -

speed chase that ended when he hit a truck, forcing it into oncoming traffic, killing both of the occupants. See id. at 863-64. The defendant engaged in several actions that were likely, if not certain, to cause death, including driving a vehicle with a blood-alcohol concentration of 0.15, running a stop sign, running a red light, speeding and passing stopped traffic at speed of 90-95 miles per hour, and leading police on a long high-speed chase. See id.

Similarly, in Doub, 95 P.3d at 117, the Court of Appeals of Kansas concluded that the evidence was sufficient to support the defendant's conviction for second-degree murder, where the defendant, while driving drunk, struck another car, ultimately resulting in a child's death, and left the scene. The defendant engaged in several actions that were likely, if not certain, to cause death, including driving after drinking, consuming more alcohol and using crack cocaine and then resuming driving, speeding and running into a vehicle, and failing to stop and render aid to the victims after the collision. See id. The Court determined that those facts, along with others, clearly demonstrated an extreme indifference to human life. See id. at 121.

By contrast, in this case, although Beckwitt's conduct demonstrated a wanton and reckless disregard for human life, it was not conduct that could be said to be likely, if not certain, to cause death, and is not conduct that satisfied the malice element of depraved heart murder. Beckwitt's conduct was reprehensible and demonstrated an indifference to the risk of danger to which Khafra was exposed and satisfied all the elements for both gross negligence and legal duty involuntary manslaughter but we cannot say that Beckwitt engaged in conduct from which a jury could reasonably conclude that death was a likely,

if not certain, result.  In accord with the Court of Special Appeals, we hold that the evidence

is insufficient to support Beckwitt's conviction for second-degree depraved heart murder.[28]

> **JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED.  80% OF COSTS TO BE PAID BY PETITIONER/CROSS-RESPONDENT AND 20% OF COSTS TO BE PAID BY MONTGOMERY COUNTY.**

---

[28]As a result of our affirmance, in accord with the mandate issued by the Court of Special Appeals, Beckwitt's conviction for depraved heart murder remains reversed and the case is remanded to the circuit court for sentencing on the conviction for involuntary manslaughter.  See Beckwitt, 249 Md. App. at 346, 401-02, 245 A.3d at 209, 242.